OVERSEAS INNS S.A. P.A., Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. CA3–87–0007–D.

United States District Court,
N.D. Texas,
Dallas Division.

May 11, 1988.

Jimmy L. Heisz of Haynes & Boone, Dallas, Tex., for plaintiff.

Cynthia E. Childress, Tax Div., Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

The court is asked to accord comity to a Luxembourg court judgment that would permit plaintiff to satisfy a U.S. income tax obligation by paying 23.49% of the taxes owed. Because the court concludes that recognizing such a decree would run counter to U.S. public policy, the court declines to accord comity to the Luxembourg judgment and denies plaintiff's motion for summary judgment.

## I.

### BACKGROUND

Plaintiff, Overseas Inns S.A. P.A. ("Overseas"), a Luxembourg corporation headquartered in Luxembourg City, Luxembourg, sues to recover income taxes that Overseas contends the Internal Revenue Service ("IRS") "wrongfully, erroneously and illegally" assessed and collected.[1] Overseas is the successor to Western Sales Limited ("Western"), a Bahamian company. On July 12, 1973, Overseas, as successor to Western, filed U.S. foreign corporation income tax returns for calendar years 1960, 1961, and 1962. Overseas filed the returns, which stated that no tax was due, "solely in

---

1. Except as noted, the facts are either stipulated or are undisputed. Accordingly, the court has not conducted an evidentiary hearing. *Cf. Drexel Burnham Lambert Group, Inc. v. Galadari,* 777 F.2d 877, 881 (2d Cir.1985), *rev'g in part,* *aff'g in part* 610 F.Supp. 114 (S.D.N.Y.1985) (when there are disputed issues of material fact, motion to dismiss on basis of international comity should not be granted without evidentiary hearing).

order to prevent the possible loss of deductions and credits under Internal Revenue Code § 882." The IRS contended that Western had engaged in trade or business in the United States during these years and had derived income from U.S. sources, a proposition which Overseas challenged.

In early 1976, the IRS issued a statutory notice of deficiency within the time prescribed by 26 U.S.C. § 6501. Overseas timely filed a petition with the U.S. Tax Court. The Tax Court proceeding was pending on December 16, 1977 when Overseas was placed in a bankruptcy-like status in Luxembourg.

At a public hearing, the Luxembourg court [2] appointed commissaires [3] who were ordered to establish, by April 1, 1978, a plan of reorganization or plan of distribution to liquidate completely Overseas' assets. The Luxembourg court vested the management of Overseas under the control of the commissaires and ordered them to compile an inventory of the assets under "controlled management" and to prepare a statement of assets and liabilities and balance sheets for the company. The court ordered the commissaires to communicate the plan "to the corporation's known creditors, co-debtors and guarantors."

In the meantime, the IRS and Overseas compromised the proposed deficiencies and penalties. The U.S. Tax Court, on January 27, 1978, entered a deficiency determination which, as of March 13, 1978, equaled $1,003,724.61, including accrued interest. On that date Overseas' proposed plan of reorganization indicated that the IRS held an unsecured claim in that amount. According to the proposal, Overseas planned to pay the IRS the equivalent of approximately $231,475.00, or 23.49% of the income tax deficiency.

On December 20, 1978, the commissaires submitted to the Luxembourg court their proposed plan of reorganization and Overseas sent a copy of the plan to the IRS. The IRS did not file an objection to the proposal. At a January 25, 1979 public hearing, the Luxembourg court rendered its written judgment, which was published in an official gazette on February 9, 1979.

It is undisputed that the Luxembourg court had jurisdiction to decide the Overseas reorganization. The parties have stipulated that the Luxembourg court, the commissaires, and Overseas committed no fraud in the receivership proceeding or in the handling or disposition of the amount owed to the IRS or any other creditor. The parties have also stipulated that Overseas acted lawfully under Luxembourg law in executing its obligations under the reorganization plan and in all matters arising out of or in connection with the receivership.

In March 1979, Overseas sent the IRS a check in the amount of 2,402,940 Belgium Francs, which constituted an initial payment of taxes. Overseas also delivered five promissory notes, each in the amount of 961,176 Belgium Francs, which notes provided for payment in equal yearly installments, without interest, beginning in February 1980. The IRS returned the initial payment because it was not payable in U.S. funds; Overseas thereafter remitted U.S. funds. Between May 1979 and March 1983, Overseas made six payments which totaled $179,135.76.

In June 1981, Overseas and a third party agreed that the third party would purchase 19% of the issued and outstanding stock of a corporation owned by Overseas. The purchaser agreed to pay part of the purchase price in cash and to pay the balance in semi-annual installments. In June 1983, the third party was to pay $247,605.48; in response to an IRS notice of levy, however, the purchaser paid the sum to the IRS. This notice of levy and payment procedure recurred in December 1983, June 1984, and December 1984. In March 1984, Overseas placed in escrow the last payment due under the reorganization plan, subject to the terms of an agreement between the government and Overseas. Overseas thereafter filed suit in the U.S. District

---

**2.** The District Court of and at Luxembourg, Second Section, sitting as a commercial court.

**3.** The commissaires were a chartered accountant and an attorney at law, both residents of Luxembourg.

Court for the District of Columbia, which transferred the case to this court.

Overseas contends it satisfied its obligation to the government by paying the sum of $179,135.76 in accordance with the Luxembourg court-approved plan of reorganization; it posits that the government, by means of the IRS levies, has collected an additional $919,835.79 to which the government is not entitled.[4]

Overseas now moves for summary judgment, contending this court should accord comity to the Luxembourg court's judgment and, in turn, hold that Overseas has fully satisfied its U.S. income tax obligations and that the government wrongfully collected the additional sums. Overseas asserts that U.S. courts, for a variety of reasons, now consistently recognize the interest of foreign courts in liquidating or winding up the affairs of their own domestic entities and in providing a single, final proceeding in which all the affairs of a debtor may be resolved with a single judgment. Overseas suggests that U.S. recognition of foreign reorganizations may enhance certainty and predictability for the debtor, its creditors, and potential investors. Overseas also argues that, because it had only nominal U.S. assets at the time of its reorganization, and only a post-reorganization event (sale of subsidiary stock) generated funds in the United States, the success of the IRS will injure Overseas' post-bankruptcy creditors and owners who were not necessarily involved with Overseas when it emerged from reorganization.

The government opposes recognizing the Luxembourg decree, contending the IRS was not afforded due process by the Luxembourg court,[5] that courts do not grant extraterritorial effect to decisions in foreign bankruptcy proceedings where to do so would prejudice the interests of the United States or its citizens (and that Luxembourg law is materially different in its treatment of the IRS than is U.S. law), that

Overseas failed to avail itself of the option available under 11 U.S.C. § 304 to maintain an ancillary bankruptcy proceeding in the United States, the Luxembourg court-approved plan does not cover assets located in the United States that are "after-acquired" assets, and the relevant Luxembourg law is against public policy.

## II.

## DISCUSSION

### A.

The doctrine of comity was defined by the Supreme Court in the seminal case of *Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895):

> "Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its law.

Comity is a recognition, a rule of practice, convenience, and expediency; it does not achieve the force of imperative or obligation, but rather constitutes "a nation's expression of understanding which demonstrates due regard both to international duty and convenience and the rights of persons protected by its own laws." *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972). Comity "summarizes in a brief word a complex and elusive concept—the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum." *Laker Airways Ltd. v.*

---

**4.** Overseas contends in the alternative that Overseas and the government agreed that the government would accept the payments prescribed by the Luxembourg court plan in full satisfaction of the taxes owed. Overseas does not seek summary judgment on this alternative theory.

**5.** Under Luxembourg law, a creditor who does not respond within 15 days of communication or publication of a reorganization proposal is deemed to have accepted the proposal. (Article 8 of the Grand Ducal Order of May 24, 1935) (English translation) (Stip. Ex. 2 at 4).

*Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C.Cir.1984).[6]

"[T]ransnational insolvency cases have been rarely submitted for formal adjudication in U.S. courts [and] the law in this complex field remains underdeveloped and inconsistent at best." Morales & Deutcsh, *Bankruptcy Code Section 304 and U.S. Recognition of Foreign Bankruptcies: The Tyranny of Comity,* 39 Bus.Law. 1573, 1575 (1984) ["Morales & Deutcsh"]. Indeed,

> American courts have been faced with the issue of how much recognition to grant foreign insolvency proceedings almost from the time the country was founded. Even though the problem is far from new, surprisingly few have adjudicated the issue [and] have been forced to rely on very old cases ... since so little guidance has developed in this area.

Unger, *United States Recognition of Foreign Bankruptcies,* 19 Int'l Law. 1153, 1156 (1985) ["Unger"]. For a century, the international law doctrine of comity provided a vague standard for resolving such international jurisdictional conflicts, producing mixed results. Morales & Deutcsh, 39 Bus.Law. at 1576. Because of the relative infrequency with which United States courts have had to deal with multinational bankruptcies, the subject has received about as much professional attention "as did letters of marque and reprisal." Gitlin & Flaschen, *The International Void in the Law of Multinational Bankruptcies,* 42 Bus.Law. 307, 314 (1987) ["Gitlin & Flaschen"] (quoting Becker, *Transnational Insolvency Transformed,* 29 Am.J.Comp.L. 706, 707 (1981)).

Two contrasting doctrines have emerged regarding the recognition of foreign bankruptcy decisions:[7] the universality theory and the territoriality theory. The universality theory recognizes in its purest form "that all of the debtor's assets wherever located be subject to the exclusive jurisdiction of the court in which the bankruptcy case is pending." Gitlin & Flaschen, 42 Bus.Law. at 309. According to this doctrine, "the laws of the state where the original bankruptcy case is situated should be recognized everywhere." *Id.* The terri-

---

**6.** The search for guiding precedent in comity cases is limited by the fact-oriented nature of the cases decided. *See Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C.Cir.1984). In the context of international bankruptcy, the doctrine of comity has been labeled a "nebulous concept." Morales & Deutcsh, *Bankruptcy Code Section 304 and U.S. Recognition of Foreign Bankruptcies: The Tyranny of Comity,* 39 Bus.Law. 1573, 1587 (1984) ["Morales & Deutcsh"].

**7.** Beginning with *Harrison v. Sterry,* 9 U.S. (5 Cranch) 289, 302, 3 L.Ed. 104 (1809), and *Ogden v. Saunders,* 25 U.S. (12 Wheat) 213, 360, 6 L.Ed. 606 (1827), in which the Supreme Court rejected the application of foreign bankruptcies to domestic property, the approach of the courts, with few exceptions, was decidedly territorial. *See* Gitlin & Flaschen, *The International Void in the Law of Multinational Bankruptcies,* 42 Bus.Law. 307, 314 (1987) (U.S. courts' attitude toward foreign bankruptcies in the past aptly described as "hostile" (citing *In re Toga Mfg. Ltd.,* 28 B.R. 165, 167 (Bankr.E.D.Mich. 1983) and as evidencing "an overt nationalistic bias favoring American creditors" (citing Morales & Deutcsh, 39 Bus.Law. at 1579)); Morales & Deutcsh, 39 Bus.Law. at 1577 (earliest U.S. decisions applying insolvency limited narrowly the application of comity where debtor's rights under foreign law would prejudice domestic creditors); Unger, *United States Recognition of Foreign Bankruptcies,* 19 Int'l Law. 1153, 1155 (1985) ["Unger"] (case law history reflected *de facto* adoption of territorial view by U.S. courts, at least when called upon to recognize effectiveness of foreign proceedings over local assets); Honsberger, *Conflict of Laws and the Bankruptcy Reform Act of 1978,* 30 Case W.Res. 631, 635 (1980) (courts have traditionally rejected the doctrine of universality in the operation of the bankruptcy laws).

In recent years, however, the doctrine is said to have "undergone drastic changes, especially in the decade proceeding [sic] the enactment of the [Bankruptcy] Code." Huber, *Creditor Equality in Transnational Bankruptcies: The United States Position,* 19 Vand.J.Transnat'l L. 741, 757 (1986). *See* Morales & Deutcsh, 39 Bus.Law. at 1579 (during past decade, U.S. case law has increasingly reflected growing movement away from decisions based on overt nationalistic bias favoring American creditors and has recognized rights of foreign debtors under U.S. law); Unger, 19 Int'l Law. at 1155–56 (subsequent to enactment of Code, bankruptcy and non-bankruptcy courts have been more inclined to recognize the effect of foreign proceedings over U.S. assets and trend is toward greater recognition of factors underlying the universality theory).

toriality theory, on the other hand, "posits that bankruptcy laws should not be recognized beyond a state's borders." *Id.*

As might be expected, Overseas asks the court to adopt the universality approach in the present case. Overseas contends that, with exceptions,[8] American courts have recently embraced the universality theory and have granted comity to foreign bankruptcy judgments. *See, e.g., In re Enercons Virginia, Inc.,* 812 F.2d 1469 (4th Cir.1987) (comity extended to Italian proceedings); *Cunard S.S. Co. v. Salen Reefer Services AB,* 773 F.2d 452 (2d Cir.1985) (dismissal based on Swedish bankruptcy); *Daniels v. Powell,* 604 F.Supp. 689 (N.D.Ill. 1985) (mere fact that foreign law is not identical insufficient to preclude comity); *Kenner Products Co. v. Societe Fonciere et Financiere Agache–Willot,* 532 F.Supp. 478 (S.D.N.Y.1982) (action suspended pending termination of French bankruptcy); *Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255 (S.D.N.Y.1979) (dismissal based on Canadian bankruptcy).[9]

To decide the present case, the court need not adopt one approach to the exclusion of the other. The court concludes, even under the universality theory, that U.S. public policy considerations[10] reason against recognizing a foreign decree that adversely affects a U.S. government tax claim.

### B.

It is a settled principal of comity that deference need not be given to foreign judgments in the face of significant countervailing public policy reasons.[11]

> [A] foreign judgment not entitled to full faith and credit under the Constitution will not be enforced within the United States when contrary to the crucial public policies of the forum in which enforcement is requested. Both rules recognize that a state is not required to give effect to foreign judicial proceedings grounded on policies which do violence to its own fundamental interests.

*Laker Airways,* 731 F.2d at 931 (footnotes omitted). This has been the rule since 1895. *Id.* at 937; *Hilton,* 159 U.S. at 163–164, 16 S.Ct. at 143. *See* Gitlin & Flaschen, 42 Bus.Law. at 320 (where public policy considerations have come into play the courts have declined to exercise comity).

It is beyond peradventure that there is, in the United States, an inexpugnable public policy that favors payment of lawfully owed federal income taxes. *See* H.R. Conf.Rep. No. 841, 99th Cong., 2d Sess. II–777, *reprinted in* 1986 U.S.Code Cong.

---

**8.** *Toga Mfg. Ltd.,* 28 B.R. 165; *Banque de Financement v. First National Bank of Boston,* 568 F.2d 911 (2d Cir.1977).

**9.** Overseas also correctly observes that other U.S. courts have recognized Luxembourg bankruptcy proceedings. *See In re Colorado Corp.,* 531 F.2d 463 (10th Cir.1976); *IIT v. Cornfeld,* 462 F.Supp. 209 (S.D.N.Y.1978), *rev'd on other grounds,* 619 F.2d 909 (2d Cir.1980). In *Cornfeld* the Second Circuit stated that "a United States court, as a matter of comity, should defer to the decrees of the Duchy of Luxembourg...." *Id.* at 916 n. 9.

**10.** It has been argued that comity is an important tool available to U.S. courts in the effort to assert U.S. law abroad. Yet even this proposition assumes that recognizing a foreign decree will not violate U.S. public policy.

> Comity, *when granted in those cases that legitimately do not fall within the public policy exception,* will aid the efforts of U.S. courts and policy-makers to assert jurisdiction and enforce judgments abroad, because foreign lawmakers will be more willing to effectuate the rulings of U.S. courts if they can rely on U.S. courts to recognize the validity of foreign laws.

Bainbridge, *Comity and Sovereign Debt Litigation: A Bankruptcy Analogy,* 10 Md.J.Int'l L. & Trade 1, 24 (1986) (emphasis added).

**11.** The court recognizes that, in order to violate domestic public policy, a foreign judgment must not merely affirmatively act on matters as to which domestic law is silent, *Compania Mexicana Rediodifusora Franteriza v. Spann,* 41 F.Supp. 907, 909 (N.D.Tex.1941), *aff'd,* 131 F.2d 609 (5th Cir.1942), but must contravene a crucial, stated public policy that affects a fundamental interest of the forum. *Laker Airways,* 731 F.2d at 931 n. 73 ("The only guideline [to determine whether the foreign judgment violates domestic public policy] is the necessity of evaluating the merits of each claim in light of the particular equitable circumstances surrounding the dual litigation."). "The 'public policy' of a state must be defined, diagrammed, well-pointed. The very words, themselves, so indicate." *Compania Mexicana,* 41 F.Supp. at 909.

& Ad.News 4075, 4865. Similarly, the legislative history to the Bankruptcy Code[12] reflects a strong policy in favor of payment of taxes, even when the taxpayer has filed for bankruptcy. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 1, 13–15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5799–5801.[13]

■ Overseas argues, however, that the IRS would not have fared better in U.S.

bankruptcy court and there is thus no reason to dishonor the Luxembourg decree on that basis.[14] Overseas reasons that, while former Bankruptcy Act[15] Chapter X § 199 [11 U.S.C. § 599][16] "effectively established a first priority in payment for the asserted claims of the United States for taxes," if a claimant did not file a proof of claim under the Act, the claimant would not be treated as a creditor under U.S. law. Former Bankruptcy Rule 10–401(b)(3)(A)[17] provid-

12. Regardless whether the court analyzes U.S. policy as expressed by the former Bankruptcy Act or current Bankruptcy Code, the policy is substantially similar with regard to payment of taxes. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 1, 13–15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5799–5801.

13. The legislative history states, in part:

In a broad sense, the goals of rehabilitating debtors and giving equal treatment to private voluntary creditors must be balanced with the interests of governmental tax authorities who, if unpaid taxes exist, are also creditors in the proceeding.

Since tax authorities are creditors of practically every taxpayer, another important element is that tax collection rules for bankruptcy cases have a direct impact on the integrity of the Federal, State and local tax systems. These tax systems, generally based on voluntary assessment, works [sic] to the extent that the majority of taxpayers think they are fair. This presumption of fairness is an asset which should be protected and not jeopardized by permitting taxpayers to use bankruptcy as a means of improperly avoiding their tax debts. To the extent that debtors in a bankruptcy are freed from paying their tax liabilities, the burden of making up the revenues thus lost must be shifted to other taxpayers.

S.Rep. No. 989, 1978 U.S.Code Cong. & Ad.News at 5799–5800.

14. Citing *Cunard S.S. Co. v. Salen Reefer Services AB*, 773 F.2d 452, 458 (2d Cir.1985), Overseas also argues that this court should accord comity because doing so would promote efficient resolution of international bankruptcies. While this is a relevant factor in determining whether to recognize a foreign judgment, public policy considerations will receive greater weight when the foreign decree violates domestic public policy. *See* Unger, 19 Int'l Law. at 1156.

Plaintiff also contends there is a presumption that U.S. courts should defer to foreign bankruptcy proceedings which are essentially fair, citing *Drexel Burnham Lambert Group Inc. v. Galadari*, 610 F.Supp. 114, 118 (S.D.N.Y.1985), *aff'd in part, vacated and remanded in part*, 777 F.2d 877 (2d Cir.1985). This language appears in the district court opinion; the circuit court

notes that "there are exceptions and limitations" to comity. 777 F.2d at 880. One such limitation is public policy. *Id.*

15. The Bankruptcy Reform Act of 1978 was not enacted until November 6, 1978 and did not take effect until October 1, 1979. Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, title IV, 92 Stat. 2549, 2682 (1978). The Luxembourg court approved the Overseas reorganization plan on January 25, 1979. Therefore, the former Bankruptcy Act applies in this case.

16. 11 U.S.C. § 599 (repealed 1978):

If the United States is a secured or unsecured creditor or stockholder of a debtor, the claims or stock thereof shall be deemed to be affected by a plan under this chapter, and the Secretary of the Treasury is hereby authorized to accept or reject a plan in respect of the claims or stock of the United States. If, in any proceeding under this chapter, the United States is a secured or unsecured creditor on claims for taxes or customs duties (whether or not the United States has any other interest in, or claim against the debtor, as secured or unsecured creditor or stockholder), no plan which does not provide for the payment thereof shall be confirmed by the judge except upon the acceptance of a lesser amount by the Secretary of the Treasury certified to the court: *Provided*, That if the Secretary of the Treasury shall fail to accept or reject a plan for more than ninety days after receipt of written notice so to do from the court to which the plan has been proposed, accompanied by a certified copy of the plan, his consent shall be conclusively presumed.

17. Former Rule 10–401 provided, in pertinent part:

(b) *Filing Proof of Claim.*

(1) *Time for Filing.* A proof of claim may be filed at any time prior to the approval of a plan except that the court may fix a different bar date for the filing of claims on notice as provided in Rule 10–209.

\* \* \* \* \* \*

(3) *Who Must File.* (A) Any creditor, including the United States, a state, or any subdivision thereof, whose claim is listed as dis-

ed that any creditor, including the United States, whose claim was listed as disputed, contingent, or unliquidated [18] as to amount, shall not, with respect to such claim, be treated as a creditor for the purposes of voting and distribution unless such creditor filed a proof of claim prior to approval of the plan. Overseas assumes the IRS would have failed to file a proof of claim in a U.S. bankruptcy proceeding because it failed to file a claim in the Luxembourg court. Based on this reasoning and assumption, Overseas asserts that the IRS should not be considered a creditor of Overseas under U.S. law, and contends the IRS recovered a greater sum in the Luxembourg court than it would have recovered in a U.S. bankruptcy court.

Overseas also argues that, had the IRS filed a proof of claim in a U.S. bankruptcy proceeding, there is no certainty the IRS would have received a greater payment in such a proceeding than it did in the Luxembourg court. A U.S. court might have approved a plan of reorganization similar to the Luxembourg plan and the IRS could have accepted an amount less than its entire claim.

The IRS responds that, under the former Bankruptcy Act, taxes that were not dischargeable [19] were entitled to fourth priority in payment, behind actual and necessary bankruptcy administration costs, wages, and expenses of defeating the plan. *See* 11 U.S.C. § 104(a)(4) (repealed 1978).[20] The plan of reorganization, which is attached as an exhibit to Overseas' complaint, shows that Overseas had assets of $22,578,726 on November 30, 1978. The IRS argues that if, as Overseas concedes, the IRS effectively had first priority to the assets of Overseas, it is plausible the IRS could have recovered from $22.5 million a debt of approximately $1 million.

In order for the court to accept Overseas' first theory, the court must embrace the assumption that the IRS would not have filed a proof of claim in a U.S. bankruptcy court proceeding. This hypothesis is not borne out by summary judgment evidence and is essential to plaintiff's attempt to circumvent obvious public policy concerns. In fact, it is permissible for the court to infer in favor of the IRS, as the nonmovant,[21] that the IRS *would* have filed a proof of claim, especially where, as here, the IRS aggressively pursued collection ac-

---

puted, contingent, or unliquidated as to amount, shall file a proof of claim within the time prescribed by subdivision (b)(1) of this rule; and such creditor who fails to do so shall not, with respect to such claim, be treated as a creditor for the purposes of voting and distribution.
Bankruptcy Rule 10–401 (repealed 1983), *reprinted in* 13A *Collier on Bankruptcy* at 10–401–1 (14th ed. 1977).

**18.** When the Luxembourg proceeding commenced, Overseas and defendant were litigating in the U.S. Tax Court the issue of Overseas' tax liability. The tax claim was compromised, however, on January 27, 1978, and the reorganization plan was not approved until January 25, 1979.

**19.** Overseas does not squarely contend that the taxes were dischargeable. In a January 4, 1988 reply memorandum, Overseas asserts, without elaboration, that if its tax dispute with the IRS had been litigated, Overseas might have prevailed and "would have had no tax liability." Elsewhere in the reply, however, Overseas "agrees that [the IRS'] tax claim would have had a priority if [the IRS] had filed a proof of claim." Accordingly, for purposes of deciding

the present summary judgment motion, the court assumes the taxes were not dischargeable.

**20.** 11 U.S.C. § 104(a) (repealed 1978) provided, in part:
The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be ... (4) Taxes which became legally due and owing by the bankrupt to the United States or to any State or any subdivision thereof which are not released by a discharge in bankruptcy: *Provided, however,,* That no priority over general unsecured claims shall pertain to taxes not included in the foregoing priority: *And provided further,* That no order shall be made for the payment of a tax assessed against any property of the bankrupt in excess of the value of the interest of the bankrupt estate therein as determined by the court....

**21.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (all justifiable inferences are to be drawn in favor of the nonmovant); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986) (inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion).

tivities and levied on the proceeds of a subsequent sale involving an Overseas subsidiary. Similarly, in order to credit Overseas' second argument, the court must assume that the IRS would have received an amount less than 100% of that which it claimed. This premise likewise is unsupported by the summary judgment record; a reasonable inference drawn in favor of the IRS would support the proposition that, out of $22.5 million in assets, the IRS as a first or even fourth priority claimant could have collected approximately $1 million.

In order to avoid the public policy concerns presented, Overseas was obligated to adduce summary judgment evidence that would establish that the IRS, either as a first or fourth priority claimant, would have received comparable [22] treatment under U.S. and Luxembourg law. Because Overseas has failed to carry this burden, the court is unable to hold that recognizing the Luxembourg decree is consonant with U.S. policy.

Accordingly, Overseas' motion for summary judgment is denied.

SO ORDERED.

---

**22.** The court does not decide today the extent to which the relief afforded the IRS in the Luxembourg court would have to approximate the relief available in a U.S. bankruptcy court to warrant according comity to the Luxembourg decree.