In re Petition of Mohammad S. HOURA-NI, Bassam Attari, and Suleiman Hafeth as the Liquidation Committee of the Estate of Petra Bank, Debtor in a Foreign Proceeding.

**Bankruptcy No. 93 B 43765 (BRL).**

United States Bankruptcy Court,
S.D. New York.

April 5, 1995.

As Corrected April 10, 1995.

Zeichner Ellman & Krause (Stuart A. Krause, Jantra Van Roy, Marc A. Lebowitz, of counsel), New York City, for A.I. Trade Finance.

## DECISION ON MOTION FOR SUMMARY JUDGMENT BY A FOREIGN BANK LIQUIDATION COMMITTEE AND A.I. TRADE INC.'S CROSS–MOTION FOR SUMMARY JUDGMENT DISMISSING PETITION FOR ANCILLARY RELIEF

BURTON R. LIFLAND, Chief Judge.

### Introduction

In this ancillary proceeding commenced under 11 U.S.C. § 304, Mohammad S. Hourani, Bassam Attari and Suleiman Hafeth (the "Petitioners"), as the Liquidation Committee (the "Committee") of Petra Bank of Amman in Jordan ("Petra Bank" or the "Bank"), move this Court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, applicable herein.through Rule 7056 of the Bankruptcy Code, and Section 304 of the Bankruptcy Code, for summary judgment deferring to a Jordanian liquidation proceeding (the "Liquidation Proceeding") and ordering the turnover of all Petra Bank funds to the Committee for administration in accordance with the laws of Jordan.[1] In turn, A.I. Trade Finance, Inc. ("A.I. Trade" or the "Respondent") opposes Petitioners' request for ancillary relief and cross-moves this Court for summary judgment dismissing the Committee's petition.

### Background [2]

**A. Prior Litigation and the Attached Funds.**

On November 30, 1989, approximately seven months before Petra Bank became a debtor in a liquidation proceeding, A.I. Trade, an international trade financing firm, commenced an action against the Bank in the United States District Court for the Southern District of New York demanding, *inter alia,* payment upon an alleged guarantee by

---

White & Case (Jeffrey Barist, Robert J. Morrow, Helen A. Feuer, Neal F. Grenley, of counsel), New York City, for petitioners.

**1.** This court has jurisdiction over this case pursuant to 11 U.S.C. § 304 and 28 U.S.C. § 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1410(b).

**2.** For more in depth background regarding the circumstances and litigation resulting in this proceeding *see A.I. Trade Fin., Inc. v. Petra Bank,* 1991 WL 33296 (S.D.N.Y. March 7, 1991), *rev'd,* 989 F.2d 76 (2d Cir.1993).

Petra Bank of certain promissory notes (the "Notes") drawn by a Greek shipping company, Nissilios Shipping Company, to a Swiss company, Welfin S.A. As recited on their face, the Notes, each in the amount of $2.5 million, were made in Amman, Jordan, from which place the Notes bear the "avals" of Petra Bank.[3] A.I. Trade claims to have purchased the Notes which were payable in New York at Irving Trust Company, now the Bank of New York. At maturity, A.I. Trade claims to have presented the Notes for payment, and Petra Bank allegedly refused payment. The dispute involves three of the six Notes initially purchased by A.I. Trade in a total amount of $7.5 million. The other three Notes were sold previously in a secondary forfaiting market.

At the time A.I. Trade filed suit, it also obtained an *ex parte* order of attachment (the "Order of Attachment") against approximately $4 million of Petra Bank's holdings in the United States (the "Attached Funds"). Petra Bank moved to vacate the attachment and dismiss the complaint for lack of personal jurisdiction. The District Court (Keenan, J.) granted Petra Bank's motion to dismiss, and the United States Court of Appeals for the Second Circuit, in a case of first impression, reversed the decision and ruled that a foreign bank's guaranty on foreign promissory notes payable in New York subjects the bank to New York's long-arm jurisdiction under N.Y. CPLR § 302(a). *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 80–82 (2d Cir.1993). The Second Circuit also reversed the vacatur of attachment and remanded the entire matter to District Court, where it is now pending before Judge Keenan (the "A.I.

Trade Action").[4] The Attached Funds are currently being held by the Clerk of the United States District Court pursuant to the Order of Attachment.

## B. Petra Bank's History and Financial Difficulties.

Petra Bank was established in 1977 as a public shareholding company ("PSC") under the laws of Jordan and, until its liquidation in 1990, conducted a banking business with its principal place of business and principal assets located in Jordan's capital, Amman.

The Central Bank of Jordan ("CBJ"), the Jordanian authority charged with supervising and inspecting banks, retained Arthur Andersen & Co. in Geneva ("Arthur Andersen") to conduct an audit of Petra Bank in 1989. In January 1990, Arthur Andersen reported that losses to the Bank amounted to hundreds of millions of dollars and advised that "the Bank has a significant net capital deficiency that raises substantial doubt about its ability to continue operation in the normal course." (Pet. 13h ¶ 7.)

Thereafter, upon CBJ's recommendation, the Economic Security Committee (the "ESC"),[5] a governmental entity created under regulations in effect since martial law was declared in 1967, ordered the liquidation of Petra Bank as of July 15, 1990 pursuant to Economic Security Committee Resolution No. 4/90, as amended by Resolution No. 7/90 dated September 20, 1990 ("Resolution 4/90", "Resolutions" or the "Petra Resolutions"). Thus, Resolution 4/90 is special legislation enacted solely to provide for the liquidation

---

**3.** An aval is employed in a forfaiting transaction and is an endorsement recorded on the note itself by two or more authorized signatures of the guarantor bank. The customs and practices of the forfaiting industry make it a fully articulated contractual obligation. *Petra*, 989 F.2d at 78, n. 1.

**4.** The suit is currently on the District Court suspense calendar due to the pendency of this proceeding instituted after the Second Circuit noted that it could not resolve issues of comity raised by Petra Bank, because an application under section 304 had not been made at that time. *Petra*, 989 F.2d at 83.

**5.** In connection with the declaration of martial law, certain regulations, denominated the Regu-

lations of Martial Law Administration for Financial and Economic Affairs No. 2 for the year 1967 (the "Martial Law Regulations") were promulgated. The Martial Law Regulations created the ESC which was empowered to

> deal with all financial, economic, banking and customs matters and cases which may arise and which are not sufficiently dealt with by the ordinary laws and regulations in force, *and shall, notwithstanding the provisions of any other law, decide same in the manner and on the terms as it may deem appropriate for the ensurance of public interest. Its resolutions shall not be subject to review by any other authority.* Article 5. (emphasis added)

of Petra Bank. Four days later, the Governor of the CBJ, who is also a member of the ESC, represented CBJ in its capacity as authorized liquidator of any licensed Jordanian bank and appointed the Liquidation Committee to liquidate Petra Bank. Subsequent to an appeal to the Court of High Justice that sustained the validity of Resolution 4/90, the Jordanian Parliament enacted a statute entitled the Protection of National Economy Law No. 3 ("PNEL 3") that incorporated Resolution 4/90 as part of Jordanian public law. Since July 15, 1990, Petra Bank has been in liquidation under this special legislation and its affairs have been managed by the Committee.

## C. Jordanian Insolvency Laws and Resolution 4/90.[6]

Petra Bank, a PSC with limited liability, was formed pursuant to Jordanian Companies Law No. 12, 1964. Chapter XIII of Companies Law No. 1 (the "Companies Liquidation Law") deals with the liquidation of PSC's such as Petra Bank. Nevertheless, bank liquidations in Jordan are often conducted with the assistance of special legislation. For example, the Islamic National Bank, a successor-in-interest to the Islamic Investment House Company, and the Jordanian Syrian Bank were liquidated under resolutions enacted by the ESC. As to the relationship between these resolutions and the Companies Liquidation Law, Resolutions Nos. 2/91 (Islamic National Bank) and 4/91 (Jordanian Syrian Bank) provide, in relevant part:

*Article 4:*

"The Central Bank shall carry out the liquidation in accordance with the rules and procedures set out in the Companies Law."

*Article 6:*

"The Central Bank shall be responsible for conducting the liquidation procedure and shall have all the powers of a liquidator pursuant to the provisions of the Companies Law."

Thus, at least to a large extent, Resolutions Nos. 2/91 and 4/91 incorporate the provisions of the Companies Liquidation Law.

As previously mentioned, the liquidation of Petra Bank is likewise governed by special legislation, but as will be demonstrated, the Petra Resolutions differ with respect to the integration and importation of the provisions of the Jordanian insolvency statutes. For purposes of this decision the most significant sections of the Resolutions involve (1) the relationship between the Resolutions and the other bankruptcy and insolvency laws of Jordan (¶ 7)[7]; (2) notice and claims processing procedure (¶ 12); (3) right of appeal (¶ 13); (4) settlement of debts and obligations (¶ 14); (5) property sales (¶ 15); (6) distribution scheme (¶ 17); (6) scope of authority of the Jordanian Central Bank (¶ 19) and (7) power of the Liquidation Committee generally.

A.I. Trade has participated in the Liquidation Proceeding by filing a proof of claim. A bar date for filing claims of sixty days from September 29, 1990 was established in the Liquidation Proceedings by publication in the *Jordan Times* on September 30, 1990. A.I. Trade was informally advised of the bar date when its counsel, Zeichner, Ellman & Krause, asked counsel for the Liquidation Committee, White & Case, whether there was "anything going on" in Amman concerning Petra. In response, A.I. Trade's counsel was sent a copy of the notice that had been published. A.I. Trade, through its retained Jordanian counsel, then submitted a proof of claim to the Committee. The claim is based on the same Notes at issue in the pending

---

**6.** The principal submissions that the court has received regarding the insolvency laws of Jordan, other than translations of the Resolutions themselves, are affidavits from Jordanian counsel, Hamzeh Ahmad Haddad for the Committee and Ali Sharif Zu'bi for A.I. Trade. The court has parsed through the affidavits to weed out the truly undisputed facts that legitimately form part of these competing motions for summary judgment. As will be discussed, "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1.

**7.** Numbers refer to the paragraph numbers in the Petra Resolutions. See the attached Appendix which is a part of, and which informs, this decision for the complete text of each of the pertinent paragraphs of the Resolutions.

A.I. Trade Action. It is not disputed that no other notice was received by A.I. Trade, and no notice was required to be sent to A.I. Trade under the Resolutions.

As will be discussed below, the material disputes between the parties primarily revolve around the interpretation and applicability of the Jordanian laws referred to previously and the fairness of the liquidation scheme that those laws establish.[8]

### Discussion

#### A. Summary Judgment.

Both sides request summary judgment. Rule 56 of the Federal Rules of Civil Procedure, made applicable herein through Bankruptcy Rule 7056, provides that summary judgment is appropriate when the Court determines that " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to [summary] judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). "The moving party has the burden of demonstrating the absence of any genuine issue of material fact, but all inferences as to the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Thomson McKinnon Sec. Inc. v. Leasure (In re Thomson McKinnon Sec. Inc.)*, 132 B.R. 9, 11 (Bankr.S.D.N.Y.1991). As Rule 56(e) specifically states, a "party may not rest upon the mere allegations or denials of [an] adverse party's pleading, but . . . must set forth concrete particulars," and bring to the Court's attention some affirmative indication that their version of relevant events is not a meritless allegation. *See also SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978).

■ Because of the issues involving Jordanian law, the court's inquiry in these motions is modified somewhat. Federal Rule of Civil Procedure 44.1 provides:

> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

Thus, the court may consider any relevant material in determining foreign law and will consider all of the evidence submitted by the parties in interpreting the liquidation procedure embodied in the Resolutions. The court will assume, however, that the parties have submitted all evidence that they believe is probative regarding interpretation of the Resolutions. Rule 44.1 does not change the general notion that motions under Rule 56 call for the parties to put forth their evidence to be presented at trial. Without conflicting oral or documentary evidence on material facts, there is nothing to try. A summary judgment motion is the time to show the court that such conflicting evidence exists.

#### B. Principals Underlying Section 304.

■ This court leans towards a "universality" approach to international insolvency proceedings.[9] Indeed, the courts in the

---

8. It should be noted that the real dispute between the parties is whether paragraph 7 (appendix) of the Petra Resolutions forecloses resort to Jordan's preference provision in its Commercial Law, Article 322. The Liquidators assert that Article 322 could be used to avoid the attachment of the Petra Funds. A.I. Trade asserts that paragraph 7 prohibits such a result. While this dispute would take center stage in Jordan, it is only one of several considerations that are relevant to this proceeding.

9. "Universality" is commonly defined in terms of a primary proceeding in a debtor's domiciliary country, with ancillary proceedings in other jurisdictions where the presence of assets or other matters require local assistance to the primary court. Universality places an emphasis on deference, through comity, to foreign insolvency proceedings. It is contrasted with "Territoriality" or the "Grab Rule" which describes the process whereby courts in each national jurisdiction sequester the property of a multinational in default and distribute it according to local rules.

The foregoing is not a limiting definition of the two approaches; there are gradients of each and many systems have characteristics of both. These have been referred to as "secondary bankruptcy" or "modified universality" regimes. *See, generally* Lawrence J. Westbrook, *Choice of*

United States generally are increasingly supportive of the philosophy underlying universality and are employing the doctrine in an ever growing number of cases and circumstances.[10] Without efforts towards coordination between the laws and tribunals of different jurisdictions, a degree of asset waste and turmoil from failed cross-border transactions is virtually certain to result when self-interested creditors seek to gain advantage for themselves under one country's system regardless of the impact on other creditors. While there is no international treaty providing for coordination between the United States and Jordan, Congress, in enacting section 304 as a foreign representative access and recognition statute, has provided the means for this Court to defer to the Jordanian liquidation proceedings should it find that certain safeguards and qualifications are met. In fact, it has been established that a bankruptcy court acting pursuant to section 304(b) "is free to broadly mold appropriate relief in near blank check fashion." *In re Culmer*, 25 B.R. 621, 624 (Bankr.S.D.N.Y. 1982); *In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 597, 606 (Bankr.S.D.N.Y.1988), *aff'd*, 115 B.R. 442 (S.D.N.Y.1990), *appeal dismissed*, 924 F.2d 31 (2d Cir.1991).

◼ While this nation's preparedness to grant deference to the laws and proceedings of other nations is considerable, it is not unlimited. Deference should only be given to those insolvency proceedings that provide a reasonable degree of certainty that the consideration of all parties' rights will be fair and impartial. *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico*, 44 F.3d 187, 191 (3d Cir.1994) ("[A] court may, within its discretion, deny comity to a foreign judicial act if it finds that the extension of comity 'would be contrary or prejudicial to the interest of the' United States"). If, after a review and analysis of both substantive and procedural aspects of non-U.S. law, it is found that the foreign proceedings are in keeping with U.S. notions of justice, deference to those proceedings is warranted by comity. *All State Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 998–1000 (2d Cir.) *cert. denied* —— U.S. ——, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993).

◼ A principal difficulty in deciding whether to yield to a foreign system is identifying the standard by which that system will be reviewed while remaining faithful to the need to find suitable justification for applying the regnant principle of comity that underlies section 304 of the Bankruptcy Code. Of course what is fair and reasonable in a foreign system is shaped to some extent by our own experience, system and values, but this is unavoidable. By necessity, there must be some objective standard of what is fair and reasonable. Each country sets its own rules in this regard. One cannot assume without inquiry that each country's procedures with respect to insolvency include respect for all parties in interest regardless of nationality and respect for insolvency proceedings regardless of venue. Due to the absence of an international treaty, this nation's recognition of the insolvency systems of others and grant of access to its courts is embodied in section 304 of the Bankruptcy Code and the emerging caselaw that has developed from the statute.

### 1. Comparison with U.S. Banking Laws and the Bankruptcy Code.

◼ The first fundamental dispute between the parties centers on determining the

*Avoidance Law in Global Insolvencies*, 17 Brook. Int.L.J. 499 (1991).

**10.** *See, e.g., Euromepa S.A. v. R. Emersian, Inc.*, 51 F.3d 1095 (2d Cir.1995) (In reversing the United States District Court's refusal to provide discovery related assistance under 28 U.S.C. § 1782 to a French firm involved in litigation in France, the Second Circuit Court of Appeals held that "[W]e read section 1782's investment of broad discretion in the district courts as an invitation for district judges to fashion creative means of implementing the statute's double goal: promoting efficiency in international litigation and persuading other nations, by example, to do the same.") *Id.* at 1102; *Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187 (3d Cir.1994) (The Third Circuit Court of Appeals vacated a United States District Court summary judgment decision that had been granted against a Mexican firm after the firm had requested a stay of the district court proceedings based upon a suspension of payments proceeding it had initiated in Mexico pursuant to the Mexican Bankruptcy and Suspension of Payments Law, because the district court did not explain why it had failed to grant deference to the foreign proceeding.)

standards under which the Jordanian Liquidation Proceedings will be reviewed by this court.[11] The Committee asserts that a comparison between the United States bank liquidation provisions of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") and the Federal Deposit Insurance Act ("FDIA") rather than simply the provisions of the Bankruptcy Code is proper. A.I. Trade responds that the court should limit its analysis to a comparison between the Resolutions and the Bankruptcy Code. A.I. Trade's view is too restrictive. The Committee's approach is more appropriate.

■ There is no requirement in section 304 that other nations adopt or mirror our Bankruptcy Code, or FIRREA for that matter. The key is that the insolvency laws in the foreign proceeding must not be repugnant to this nation's general principles of justice, regardless of the form in which those principles are manifested. Only subsection (c)(4) of section 304 specifically references title 11, a bankruptcy statute. It states that proceeds should be distributed "substantially in accordance with the order prescribed in this title." Even this is not an inflexible requirement. *See, e.g., In re Koreag, Controle et Revision, S.A.,* 130 B.R. 705, 715 (Bankr.S.D.N.Y.1991) (determining that a creditor's secured claim under NY law, relegated to unsecured status under Swiss law, does not preclude turnover of funds), *aff'd* (Knapp, J.), *vacated on other grounds,* 961 F.2d 341 (2d Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *Axona,* 88 B.R. at 613 (deferring to Hong Kong's distribution scheme derived from the English Companies Act).

In fact, a comparison to United States' banking laws is particularly appropriate here because American banks are liquidated under FIRREA and FDIA, not the Bankruptcy Code. In addition, FIRREA and the Resolutions were prompted by the same type of event—a banking crisis. Finally, this court is not the first to look to American bank liquidation laws when faced with a foreign bank liquidation. *See, In re Banco de Descuento,* 78 B.R. 337, 339–40 (Bankr.S.D.Fla. 1987). Thus, comparisons between these two statutory schemes is entirely fitting.[12]

■ Applying the foregoing principles to the particular facts of this case, A.I. Trade has raised many legitimate questions by pointing to the lack of procedural and substantive safeguards in the Resolutions and the degree of authority which the Committee enjoys under them. The Petitioners attempt to explain away these significant gaps in the fairness of the liquidation process without citations to other statutes or legal precedent. Instead they rely on the Declaration and Response Declaration of Hamzeh A. Haddad (collectively, the "Haddad Declarations"), the Committee's Jordanian legal expert. The Haddad Declarations, in an apparent attempt to put the best light on Petitioners' intentions, appear to contradict the Resolutions on key points and, where there is no contradiction, assures the court that the Committee will use its discretion to do what is right. In this regard, the Haddad Declarations require

---

11. A.I. Trade has not contested the threshold issue of whether the Liquidation Proceeding is a "foreign proceeding" within the meaning of section 304(a) of the Bankruptcy Code. My colleague, Judge James L. Garrity, Jr., has recently explored the limits of this term in *Petition of Tam,* 170 B.R. 838 (Bankr.S.D.N.Y.1994). While the Liquidation Proceeding has many of the characteristics that prevented the winding up proceeding in *Tam* from qualifying as a foreign proceeding (*see Tam,* 170 B.R. at 843) the instant Liquidation Proceeding is distinguishable as a bank liquidation such as that at issue in *In re Banco de Descuento,* 78 B.R. 337 (Bankr.S.D.Fla. 1987).

12. Implicit in A.I. Trade's position is the belief that FIRREA does not provide all of the proce-

dural and substantive safeguards provided for in the Bankruptcy Code and that, therefore, the Bankruptcy Code establishes a more difficult standard for the Petitioners to meet. While this may be true, it does not establish that FIRREA is inconsistent with this country's notions of fairness. Indeed, it would be ironic if section 304 were interpreted to refuse comity to another country's liquidation of a bank under provisions identical to FIRREA. It would be akin to finding that FIRREA is repugnant to this country's notions of justice. This court is not prepared to make such a finding. Consequently, FIRREA is part and parcel of this nation's system of justice and helps to establish this country's model of fairness.

a substantial leap of faith, but cannot provide confidence or certainty in the absence of a specific governing body of law. In short, the key element of predictable treatment for claimants is missing.

While A.I. Trade, through the Declaration of Ali Sharif Zu'bi, a Jordanian legal expert, has offered its own somewhat slanted expert's opinion on how various issues would be handled in the liquidation process, this court's decision is based principally on its own review of the Resolutions. That review demonstrates that the plain language of the Resolutions does not provide sufficient minimal protections. Indeed, contrary to the Petitioners' position, the Resolutions seem to prevent the Committee from adopting appropriate provisions to supplement the Resolutions. Specifically, paragraph 7 of the Resolutions provides:

> A lawsuit for declaring the bankruptcy or insolvency of Petra Bank shall not be considered and the provisions of bankruptcy or insolvency provided for under the Commercial Law or Civil Law or any other law shall not be applicable thereto.

This provision seems to foreclose the possibility of supplementing the Petra Resolutions with provisions from the Jordanian Commercial Law or Civil Law.

At best, the Resolutions might allow the Committee or the CBJ to adopt other provisions as they deem fit.[13] The Committee claims that this flexibility allows it to construct a fair process. Within this general grant of authority, the Committee, with the assistance of the CBJ, could easily construct a process that is eminently fair to all concerned despite the anomalies and gaps in the Resolutions. The crucial and obvious point in this analysis, however, is that they may also forge one that is not.

### 2. Application of Section 304.

In applying section 304(c), provision by provision, to the Petra Resolutions, it becomes clear that there is little to ensure integrity and fairness in the liquidation process embodied in the Resolutions. More-

over, as will be seen, the Committee's repeated emphasis on a claimant's right to judicial appeal from an adverse determination on its claim as a panacea for the numerous deficiencies in the Resolutions begins to ring hollow upon a close and comprehensive inspection of the special Petra liquidation scheme.

### a. Section 304(c)(1)—Just Treatment of All Holders of Claims or Interests.

The Committee has broad power to dispose of Petra's assets and claims in any manner it "deems appropriate." (Resolution ¶ 14 A). Creditors have no general right to appeal from actions of the Committee with respect to disposition of assets or from claims adjudication (other than their own) and, indeed, have no access to any information about such actions.

Notably absent from the Resolutions and applicable law, is any language granting an interested party a right to know about or object to Committee action. It is undisputed that "under the Resolutions[,] any creditor or debtor has not been given the express right to object to the Committee's decisions, other than those decisions related to his own account." (Haddad Resp. Dec. ¶ 25). This participatory gap includes, for example, compromising claims by or against the estate or the possibility of discriminatory treatment of claims. Furthermore, the Committee may simply deny a claim without giving any reason as to whether the denial is based on determinations of fact or law. *See e.g., Culmer*, 25 B.R. at 630 (granting 304 relief and noting with approval provisions requiring statements of grounds for claim rejection). Petitioners respond to these deficiencies not with citations to law or statutory authority, but with the Haddad Response Declaration. The Haddad Response Declaration states:

> In my opinion the Liquidator is legally bound to give access to any creditor to Petra's books and records pursuant to the Companies Act.

> \* \* \* \* \* \*

---

13. *See* Petra Resolutions at ¶ 19. ("The Jordanian Central Bank's Board of Directors is authorized to take any decision it may deem fit or

anything that is connected with Petra Bank that was not dealt with under the provisions of this Resolution.")

[T]o the best of my knowledge [the Committee] does issue statements setting forth the reasons for its decisions.

(Haddad Resp. Dec. ¶¶ 18, 19.)

The Haddad Response Declaration cites select instances where the Jordanian Court of Appeals has ordered the Committee to disclose additional information to a *particular* claimant. However, this also is not an adequate assurance of fairness. Although a creditor may apply to the court on an ad hoc basis in hopes of obtaining information, this process is not guaranteed by right. Even if the court orders disclosure, there is still no systematic framework by which information may be obtained, used, or considered in any meaningful way during the proceeding. Any right to appeal under the Resolutions is severely limited by practical considerations.

Both parties refer to an action brought in Jordan challenging certain procedures regarding the liquidation of Petra Bank. (Haddad Dec. ¶ 38; Zu'bi Dec. ¶ 13) The Jordanian Court of Appeals upheld the challenge based on notions of fairness because there was no Resolution provision granting either the debtor or creditor an opportunity to be heard and the claimant had not had an adequate opportunity to prove his claim. (Court of Appeal, Case Nos. 1557/93 dated February 14, 1994; 1558/93, dated January 31, 1994). Petitioners herein appealed and prevailed. The Supreme Court of Jordan overruled the lower court decision. The appellate decision upheld Petra Bank's procedures as acceptable and further held that the extent to which evidence will be received and reviewed by the Liquidation Committee is largely within the Committee's discretion. (Court of Cassation Case No. 385/94, Decision No. 118, dated April 19, 1994 and Case No. 419/94, Decision No. 47, dated May 10, 1994) (Zu'bi Dec. Ex. D). In general, it appears that the taking and giving of information is largely within the discretion of the Committee. Fundamental requisites of due process of law include access to information and an opportunity to be heard in a meaningful manner, rights not fully guaranteed by the Resolutions. For effective participation, a certain degree of transparency within the system is needful.

The Petitioners' reliance on a comparison with U.S. banking laws to address due process and procedural openness concerns is unavailing. The FDIA, in contrast to the Resolutions, has explicit provisions governing the disposition of assets. For instance, 12 U.S.C. § 1821(d)(13)(E) provides that in connection with any sale or disposition of assets, the FDIC must, *inter alia,* maximize the net present value of the return of such assets, minimize the amount of loss realized and ensure adequate compensation and fair and consistent treatment of offers. FDIA also includes fraudulent conveyance provisions to allow for recovery of fraudulent transfers made within five years of liquidation. 12 U.S.C. § 1821(d)(17). In turn, the Resolutions have no comparable scheme to assure just treatment for all of Petra Bank's creditors.

The Resolutions are similarly devoid of provisions allowing for equitable subordination or prohibiting certain asset sales, the purpose of which is to offset or undo any fraud or inequities in claims that may be unjust or unfair to other creditors. *See, e.g., In re W.T. Grant Co.,* 4 B.R. 53, 74 (Bankr. S.D.N.Y.1980). For example, section 510(c) of the Code provides that insider claims may be equitably subordinated to depositor and creditor claims, "a powerful tool to correct and modify any wrongdoing perpetrated on the bankrupt debtor." *See e.g., Interpool Ltd. v. Certain Freights of M/V Venture Star,* 102 B.R. 373, 379–80 (D.N.J.1988) (denying 304 relief and noting, *inter alia,* the absence of equitable subordination provisions), *appeal dismissed,* 878 F.2d 111 (3d Cir.1989). In addition, FDIA section 1821(p) prohibits the sale of assets to certain persons, including for example, those who default in material amounts to the failed bank, those who have engaged in fraudulent activities with regard to the bank, and officers and directors who contribute to the bank's losses. 12 U.S.C. § 1821(p)(1) & (2).

**b. Section 304(c)(2)—Protection of Claim Holders Against Prejudice and Inconvenience in the Processing of Claims.**

The provisions for notice to creditors in the Resolutions are limited to such an extent that they violate basic standards of procedur-

al fairness. Notice is a central tenet of procedural fairness and assures justice and fair dealing by giving creditors an opportunity to present and contest the status of their claims, while inadequate notice contravenes these notions by depriving property without due process of law. "An elementary and fundamental requirement of due process ... is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Tr. Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted).

Both FDIA and the Bankruptcy Code require clear notice, in many cases by both mail and publication. FDIA section 1821(d)(3)(C) states:

**Mailing required**

The receiver shall mail a notice ... to any creditor shown on the institution's books—

(i) at the creditor's last address appearing in such books; or

(ii) upon discovery of the name and address of a claimant ... within 30 days after the discovery of such name and address.

12 U.S.C. § 1821(d)(3)(C). Moreover, section 342 of the Code sets forth explicit notice requirements in a bankruptcy proceeding, and Bankruptcy Rule 2002(1) allows the court to order notice by publication only when mailing is impracticable or as a supplement to notice by mail. With respect to creditors whose existence and location is known, notice by publication alone is not only prohibited under both FDIA and the Bankruptcy Code, but would violate a most basic form of procedural fairness—that of letting all have an equal opportunity to know how their stake in the pool of estate property may be effected. "It would be idle to pretend that publication alone ... is a reliable means of acquainting interested parties of the fact that their rights are before the courts." *Mullane,* 339 U.S. at 315, 70 S.Ct. at 658. ■ In the present case, A.I. Trade was indisputably a "known" claimant at the commencement of the liquidation case. Petra Bank was involved in litigation with Respondent at the time liquidation began. Only

direct inquiries to Petitioners' counsel brought the Liquidation Proceeding's bar date to A.I. Trade's attention. The Petitioners focus on the fact that A.I. Trade did, in fact, receive notice in time to file in a claim in the Liquidation Proceeding. This emphasis is misplaced. It is the integrity of the liquidation process being reviewed that is important in a section 304 proceeding, not the happenstance of a particular incident.

The Petra Resolution notice provisions state that creditors must file claims within sixty days after publication of the Resolutions in the Official Gazette or "in one or more local daily newspapers." (Resolutions ¶ 12(a)). While it may or may not be reasonable to expect foreign nationals to monitor daily Jordanian newspapers when conducting business with a foreign bank engaged in international transactions, it certainly becomes unreasonable when a clear option, such as mailing to a known litigant creditor, is present. Notice is not inadequate because it "fails to reach everyone, but because, under the circumstances[,] it is not reasonably calculated to reach those who could be easily informed by other means at hand." *Mullane,* 339 U.S. at 319, 70 S.Ct. at 659. In the present case, chance alone prevented an injustice.

**c. Section 304(c)(3)—Prevention of Preferential or Fraudulent Transfers.**

Noticeably absent from the Petra Resolutions is any provision for the recovery of preferences and fraudulent conveyances. Nevertheless, the Attached Funds are at issue here because, pursuant to Article 322 of the Jordanian Commercial Law ("Article 322"), a decree of bankruptcy may, in substance, be moved back to such a time (no more than eighteen months from the date of judgment of bankruptcy) as reflects when the debtor stopped payment of its debts in the ordinary course. Pursuant to Resolution 4/90, Petra Bank is in liquidation effective as of July 21, 1990. The attachment of The Fund in New York by A.I. Trade occurred approximately seven months prior to the effective date of liquidation.

The Committee claims that the lack of reference to preferences in the Resolutions and the existence of Article 322 in the Commercial Law gives it the discretion to recover the Fund as a preference. Citing paragraph 7 of the Petra Resolutions, A.I. Trade disputes this contention. Whether or not Article 322 can be adopted into the Petra Resolutions is, at best, an open question. Again, the potential for ad hoc application of a recovery statute is apparent. The only evidence Petitioners present to rebut Respondent's argument that paragraph 7 prevents resort to Commercial Law is the Haddad Response Declaration which states:

Where special rules are enacted, priority is given to those special rules. Gaps, if any, in the special rules are filled by reference to the general rules of law ...

the provisions of the Resolutions always supersede those of the Companies Act, notwithstanding whether this is provided for in the Resolutions or not.

(Haddad Resp. Dec. ¶¶ 5, 14.) No authority is cited for these statements. Moreover, applicability of the Companies Law does not appear to be a gap in the Petra Resolutions. Paragraph 7 seems to say that the Companies law is not applicable. This is in stark contrast to Resolutions Nos. 2/91 and 4/91, governing the liquidation of the Jordanian Syrian Bank and the Islamic Investment Bank, which both incorporate the Companies Law at least to some extent.[14] Thus, when compared to the scheme imposed for Petra, it appears a more predictable, disciplined regime for the collection, distribution and administration of assets governs the proceedings of these other banks.

Finally, in addition to the discretion of the Committee, the Resolutions seem to give the CBJ great discretion to supplement the Resolutions, but only when and how the CBJ "deems fit." *See* ¶ 19 of the Resolutions.

This broad license provides another illustration of the Petitioners' failure to demonstrate that the Petra Resolutions provide the certainty and safeguards that section 304 contemplates.

**d. Section 304(c)(4)—Distribution Substantially in Accordance with the Order Prescribed by the Bankruptcy Code: Protection of Secured Creditors.**

The Resolutions also provide no safeguard for secured creditors' rights. Resolution ¶ 17 states that after certain unsecured priority claims are satisfied, "the remaining [Bank] assets shall be distributed pro rata among the creditors." The plain meaning of this text provides no distinction between secured and unsecured creditors. Even if other Jordanian law such as Execution Law No. 31 (which makes such a distinction under the Companies Liquidation Law by providing a preference for secured creditors) were applicable, the now familiar concern over fair and predictable application arises.

Deference to foreign proceedings is warranted under principles of comity when they provide, *inter alia,* a sure scheme for differentiation between secured and unsecured creditors, whether or not the terms are uniform with those of the Code. *See e.g. Koreag,* 130 B.R. at 713–15; *Axona,* 88 B.R. at 631. However, a system that does not clearly distinguish at all is suspect.

**e. Section 304(c)(5)—Comity.**

The courts in this Circuit have repeatedly recognized that principles of comity encourage deference to foreign bankruptcy proceedings, but only when the foreign proceeding does not violate the "laws or public policy of the state." *Drexel Burnham Lambert Group Inc. v. Galadari,* 777 F.2d 877,

14. Similarly, with reference to a bank liquidators authority, FDIA states:

In addition to and not in derogation of the powers conferred and the duties imposed by this section on the Corporation as conservator or receiver, the Corporation, to the extent not inconsistent with such powers and duties, shall have any other power conferred on or any duty (which is related to the exercise of such power) imposed on a conservator or receiver for any

Federal depository institution under any other provision of law.
12 U.S.C. § 1821(c)(2)(B). This provision broadens the FDIC's powers to include other federal law, such as the preference provisions of 12 U.S.C. § 91. This directly contrasts with Resolution ¶ 7 which appears to narrow the Committee's powers to those delineated in the Resolutions.

880 (2d Cir.1985) (citation omitted). The court must first determine whether a foreign bankruptcy comports with American notions of fairness and due process. *Zeidenberg v. Polly Peck Int'l PLC.,* 91 Civ. 3246, 1992 WL 178626, *3 (S.D.N.Y. July 16, 1992). While "comity does not require the laws of different jurisdictions to be identical," the court should "consider [ ] the full scope and procedural fairness" of the foreign laws. *Axona,* 88 B.R. at 610, 611; *see also All State Life Ins. Co.,* 994 F.2d at 998–1000; *Philadelphia Gear Corp.,* 44 F.3d at 191.

■ It should be clear at this point that the central difficulty with the Petra Resolutions at issue is that there is no way for an objective party to construe them such that they ensure fair and equal treatment of all creditors. The only assurance the Committee can give this court is a subjective assertion that a just and fair course of action will be taken by itself, the CBJ and the ESC. This declaration is made without source foundation and is *ipse dixit.* Therefore, regardless of the way in which the court interprets the language of Petra Resolution ¶ 7, there remain insufficient internal Jordanian procedural safeguards to ensure the fair treatment of all creditors. If one were to construe the language of paragraph 7 to preclude resort to other law, then the liquidation process is wholly devoid of minimum safeguards. On the other hand, if paragraph 7 is construed to allow inclusion, there is only Petitioners' current assurances to this court that the Liquidation Committee will use its power to do what is right. That choice still remains largely within the Committee's judgment. In sum, it is this latter possibility that blocks the Petitioners from their quest for relief. Even if the Committee could prove at an evidentiary hearing that the liquidation has been conducted equitably to date, it could not provide any guarantee that such conduct would continue. Respondent and this court have no way of knowing, until the liquidation is over, whether, in retrospect, the proceeding was fair. This lack of certainty precludes recognition of this particular Jordanian procedure. Knowing the rules is an essential part of fairness and equity. *Cf. Papachris-*

*tou v. City of Jacksonville,* 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972) ("Where ... there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law.").

Having limited its analysis to the specifics of the Petra Bank special legislation and the stylized Petra Resolutions, this court takes no position as to the availability or non-availability of ancillary relief or assistance based upon *other* proceedings [15] under the laws of the Kingdom of Jordan such as those conducted under the Companies Liquidation Law or those modelled after the Islamic National Bank or Jordanian Syrian Bank Resolutions.

■ While it appears that the Petra Resolutions are a somewhat understandable extreme measure adopted by the government of Jordan to confront a banking crisis, this court cannot overlook the statute's lack of fundamental protections regardless of the rationale for its enactment. In sum, section 304 does not require deference to the process embodied in the Petra Resolutions. It requires deference to a system or scheme that is fair and reasonable, not to one that *might* prove to be.

### Conclusion

For the foregoing reasons, the Petitioners' motion for summary judgment is denied. A.I. Trade's motion for summary judgment is granted and the section 304 petition is dismissed.

It is So Ordered.

### APPENDIX

By virtue of the powers vested in us pursuant to Article (5) of the Instructions of the Martial Administration of Financial and Economic Matters No. (2) of 1967 and after review of the letter of His Excellency the Governor of the Jordanian Central Bank No. 7020/15303 dated 12/7/1990 and the report of auditors Arthur Andersen/Dajani and Alauddin attached to the letter of Petra Bank

---

**15.** *See* 11 U.S.C. 101(23), definition of foreign proceeding.

dated 12/6/1990 pertaining to the Petra Bank Joint Stock Company (Petra Bank), and with due consideration to the Economic Security Commission Resolution No. (2/90) dated 10/7/1990, we resolve the following.

Notwithstanding the provisions of the Companies Law and any other law or regulation:

\*   \*   \*   \*   \*   \*

(7) A lawsuit for declaring the bankruptcy or insolvency of Petra Bank shall not be considered and the provisions of bankruptcy or insolvency provided for under the Commercial Law or Civil Law or any other law shall not be applicable thereto.

\*   \*   \*   \*   \*   \*

(12) A.   Any Creditor of Petra Bank shall submit his claims to the liquidator within sixty days of the date of the publication of his Resolution in the Official Gazette or as of the date of publication of an announcement to this effect in one or more daily local newspapers.   Failing that, he shall forfeit his right to claim same.   A creditor should submit evidentiary documents with his claim.   The liquidator may seek information from the creditor for any matter and he may require any additional evidence concerning the claim.

B.   The liquidator shall prepare statements of the debts owed to Petra Bank on the basis of the bank's records or any other official or unofficial records or papers which the liquidator feels should be taken into consideration.   The liquidator shall send to each debtor his respective statement.   A debtor may object to the statement to the liquidator within thirty days of the date of his being notified and his objection must be clear and show cause and should be backed by evidentiary documents.   The liquidator may seek clarification on any matter from the debtor and he may ask him to submit other information concerning the objection.

C.   If a debtor does not object within the thirty days referred to under paragraph B of this Article, the statement shall be considered as a final judicial decision that may not be challenged in any way whatsoever.

(13) A.   The liquidator shall decide on the claims of creditors and on the objection of debtors as promptly as possible and his decision may be challenged before the Court of Appeals within fifteen days of the date of serving the decision to the creditor or debtor, as the case may be. The appeal decision may be challenged before the court of cassation within fifteen days of the date of notification of the appeal judgement.

B.   Both the courts of appeal and cassation shall decide the claim within three months from the date of filing of the claim and the challenge shall not affect the power of the liquidator to initiate or continue levying attachment against the funds of a debtor that are mortgaged in favor of Petra Bank and no claim to this effect may be considered.

(14) A.   The liquidator may take any measure he deems appropriate to settle the rights and obligations of Petra Bank, including the collection of the bank's personal rights (debts) or to transfer same to any person.   This shall include the sale or assignment of these rights. The liquidator may effect settlements with any debtor as he sees fit and he may sell Petra Bank's real, personal and incorporeal rights.   He may also assign to any third party any real estate lease contracts concluded by the bank in its capacity as lessee without making it conditional upon the approval of lessor.   In such case the new lessee shall subrogate Petra Bank in the lease contract.

\*   \*   \*   \*   \*   \*

(15) A.   If the liquidator wishes at any time to sell any of Petra Bank's real rights (such as property, vehicles, furnishings, and other material movables), or if he wishes to sell any funds owned by any of Petra Bank's debtors, he may carry out the sale:

1.   Either by public auction or by sealed envelope according to the procedures which the liquidator deems fit without being restricted by the procedures of

sale by auction or sealed envelope that are stipulated in the laws and regulations in force.

2. Or in accordance with a special assessment to be made by a commission comprising a judge designated by the Minister of Justice and two experts designated by the liquidator. The assessment determination shall be passed unanimously or by majority vote.

B. The liquidator may, at any time, change these methods and resort to any of the other two methods, as he deems fit.

\*　　\*　　\*　　\*　　\*　　\*

(17) The liquidator shall repay Petra Bank's debts in accordance with the following sequence of priorities:

A. 1. Debts due to employees resulting from their employment with Petra Bank;

2. Public Treasury debts, including debts due to the Jordanian Central Bank;

3. The debts due to the municipalities;

4. The rentals due for property leased to Petra Bank;

5. The remaining assets shall be distributed pro rata among the creditors.

B. The liquidator may commence repayment of these debts according to their priorities during the liquidation formalities as funds from Petra Bank's assets become available.

\*　　\*　　\*　　\*　　\*　　\*

(19) The Jordanian Central Bank's Board of Directors is authorized to take any decision it may deem fit concerning any matter or anything that is connected with Petra Bank that was not dealt with under the provisions of this Resolution.