**In the Matter of TOGA MANUFACTUR-ING LIMITED, a Canadian debtor.**

**Bankruptcy No. 82–07072–G.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Feb. 28, 1983.

Michael H. Whiting, Stark & Regan, P.C., Troy, Mich., for Peter T. Hesse Enterprises, Inc.

Jerome D. Frank, Smith, Hirsch, Brody & Weingarden, Detroit, Mich., for Peat Marwick Ltd.

## MEMORANDUM OPINION AND ORDER

RAY REYNOLDS GRAVES, Bankruptcy Judge.

This cause comes before this Court upon the petition of Peat Marwick Limited, the Canadian Bankruptcy Trustee of the debtor, Toga Manufacturing Limited, a Canadian corporation. Peat Marwick Limited petitions pursuant to Section 304 of the Code, Bankruptcy Reform Act of 1978, 11 U.S.C. § 304. The facts giving rise to this cause are as follows.

In March, 1977 and in December, 1978, Peter T. Hesse Enterprises, Inc. ("Hesse"), a Michigan corporation, and Toga Manufacturing Limited ("Toga") executed written contracts making Hesse the exclusive sales representative for Toga to procure orders for automotive parts from Volkswagon, its subsidiaries, General Motors Corporation and Ford Motor Company. The contracts provided that claims for alleged breaches of the contracts would first be submitted to the American Arbitration Association.

In late 1980, Hesse alleged that Toga withheld commissions due Hesse from sales to selected companies located outside of the United States. Hesse filed an arbitration claim with the American Arbitration Association; an arbitration hearing was held on February 1, 1982, in Detroit, Michigan. On February 22, 1982, an arbitration award was entered in favor of Hesse in the amount of $196,978.

On March 1, 1982, Hesse filed a petition in the Wayne County Circuit Court to enforce its arbitration award. Toga responded with a motion to vacate the arbitration award for the reason that Toga was not represented at the February 1 arbitration

hearing. On March 26, 1982, the Honorable Thomas J. Foley, Wayne County Circuit Judge, heard Hesse's motion to enforce and Toga's motion to vacate; Judge Foley adjourned these motions and ordered Toga's President, Wolfgang Grohs, to appear before him on April 1, 1982, to testify concerning his failure to attend the February 1 arbitration hearing.

On April 1, 1982, Toga agreed to a partial settlement of the dispute by entry of a consent judgment in favor of Hesse in the amount of $60,675; this amount was only for commissions due Hesse from sales to customers located within the United States. The consent judgment also provided that the issue of Hesse's entitlement to commissions from foreign sales would be resubmitted to arbitration. This consent judgment was entered on April 1, 1982.

Throughout this period Toga suffered other financial problems and on April 29, 1982, Toga executed a consensual default agreement with its largest secured creditor, Canadian Imperial Bank of Commerce ("Bank"). Under this agreement the Bank took control of the operations and assets of Toga. The Bank appointed Peat Marwick, Ltd. as its receiver to continue the operations of Toga.

The arbitration of the foreign commissions issue occurred on May 3, 1982. Peat Marwick repudiated the April 1, 1982, consent judgment. On May 13, 1982, an arbitration award in favor of Hesse in the amount of $152,978 for commissions from foreign sales was entered. On May 21, 1982, this award was confirmed by judgment of the Wayne County Circuit Court.

As a result of the repudiation of the April 1 consent judgment, Hesse served writs of garnishment on Volkswagon of America, Inc., General Motors Corporation and Ford Motor Company on May 4, 1982; these writs sought the monies Toga allegedly owed Hesse for commissions from sales to customers located in the United States. These garnishee defendants filed garnishment disclosures: Volkswagen of America, Inc., admitted $77,821.82 owing to Toga; General Motors Corporation admitted indebtedness to Toga in the amount of $21,100.87; and Ford Motor Company admitted a liability of $3,537.44.

On May 13, 1982, the Bank intervened in the Wayne County Circuit garnishment action, alleging that it had a perfected security interest in Toga's accounts receivable superior to that of Hesse's judgment lien. On May 20, 1982, Judge Foley took the Bank's claim under advisement and ordered the garnishee defendants to pay the money owed to Toga to the Clerk of the Wayne County Circuit Court pending resolution of the security interest priority dispute between the Bank and Hesse.

On June 10, 1982, Hesse served a second set garnishment writs on Volkswagon, General Motors and Ford in an attempt to satisfy its judgments against Toga, totalling an amount of $215,000.00.

On July 9, 1982, following submission of briefs and oral argument, Judge Foley entered an order finding that the Bank's security interest was superior to Hesse's judgment lien. The court directed that the garnisheed funds be paid to Peat Marwick, Ltd. as receiver for the Bank.

On July 28, 1982, Hesse appealed Judge Foley's order to the Michigan Court of Appeals and simultaneously moved the Circuit Court to stay enforcement of its July 9 order pending appeal. The motion was granted, and the appeal is still pending. To date, Volkswagon of America, Inc., General Motors Corporation and Ford Motor Company have paid $215,000.00 to the Clerk of the Wayne County Circuit Court.

On October 18, 1982, an unsecured creditor of Toga, Namasco Limited, filed a petition in order to institute an involuntary proceeding in bankruptcy under Canadian and Ontario law before the Supreme Court of Ontario in Bankruptcy. This petition was granted after notice and hearing on November 16, 1982. This foreign proceeding is governed by the Bankruptcy Act of Canada, R.S.C.1970, c. B–3 as amended. On that same day, by order of the Supreme Court of Ontario in Bankruptcy, Peat Marwick Limited was appointed Trustee of the Estate of Toga Manufacturing Limited.

On December 14, 1982, the Trustee brought this ancillary proceeding pursuant to 11 U.S.C. § 304 requesting an injunction against all creditors of Toga from commencing action against, or continuing to take action against, Toga or its assets and an order directing the Wayne County Circuit Court Clerk to turn over the $215,000.00 fund to the Trustee.

■ Preliminarily, in order for section 304 to be applicable,[1] it must be shown that there is a foreign bankruptcy case concerning the debtor and that the debtor has assets in the United States, more particularly, in the judicial district where it filed its ancillary proceeding. *Matter of Stuppel,* 17 B.R. 413 (Bkrtcy.S.D.Fla.1981). At bar, the Trustee has averred that Toga is involved in bankruptcy proceedings in Canada, and that Toga possesses assets in the United States. Thus, Peat Marwick has properly invoked this Court's jurisdiction.

Under Canadian bankruptcy law, the term "property" is defined to include "money ... whether situated in Canada or elsewhere...." Section 2 of the Bankruptcy Act, Revised Statutes of Canada, 1970, Chapter B–3, as amended ["Canadian Bankruptcy Act."]. Section 47(c) of that Act defines property of the estate to include "all property wherever situated of the bankrupt at the date of his bankruptcy or that may be acquired by or devolve on him before his discharge...." Hence, under Canadian law, the fund held in the Wayne County Circuit Court constitutes property of the estate.

1. Subsections (a) and (b) of section 304 provide:
   (a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.
   (b) Subject to the provisions of subsection (3) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—
   (1) enjoin the commencement or continuation of—
   (A) any action against—
   (i) a debtor with respect to property involved in such foreign proceeding; or
   (ii) such property; or
   (B) the enforcement of any judgment against the debtor with respect to such property, or

## WHAT EFFECT, IF ANY, IS TO BE GIVEN TO FOREIGN BANKRUPTCY LAW AS IT CONCERNS PROPERTY LOCATED IN THE UNITED STATES?

Historically, the bankruptcy laws of our country have been hostile towards claims asserted by foreign trustees in bankruptcy against alleged estate property located in the United States. "[T]he bankrupt law of a foreign country is incapable of operating a legal transfer of property in the United States." *Harrison v. Sterry,* 9 U.S. (5 Cranch) 289, 302, 3 L.Ed. 104 (1809). The Supreme Court affirmed this principle in *Odgen v. Saunders,* 25 U.S. (12 Wheat.) 213, 6 L.Ed. 606 (1827) where it held that a discharge in bankruptcy rendered by a foreign court is not a defense against a creditor who is a citizen of the United States unless the creditor first consented to the foreign court's jurisdiction over his claim.

The *Sterry* and *Saunders* cases describe the conflicts of laws doctrine of *pluralism.* "Under this theory, any country is free to entertain proceedings pursuant to their bankruptcy laws without regard to any foreign judgment." Honsberger, *Conflict of Laws and the Bankruptcy Reform Act of 1978,* 30 Case W.Res.L.Rev. 631, 634 (1980). Adherence to this theory produces a result inimical to the policies of the Canadian Bankruptcy Act and the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101 *et seq.*[2]

Section 304 of the Code, 11 U.S.C. § 304, embodies the *universal* theory of conflicts

any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;
(2) order turnover of the property of such estate, of the proceeds of such property, to such foreign representative; or
(3) order other appropriate relief.

2. Both the Canadian and American bankruptcy laws provide for fresh starts for debtors and equality of distribution among debtors. *See generally,* Riesenfeld, *The Status of Foreign Administrators of Insolvent Estates: A Comparative Survey,* 24 Am.J. of Comp.L. 288 (1976); S.Rep. No. 989, 95th Cong., 2d Sess. 35, *reprinted* in [1978] U.S.Code Cong. & Ad.News 5787. "This doctrine as applied by some coun-

of laws with some qualifications; this theory requires that a judgment rendered in the domicile of the debtor be recognized in all other jurisdictions.[3] Section 304(c) provides:

(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

We take judicial notice of the close geographic proximity of Canada and the United States, specifically Wayne County, Michigan and Essex County, Province of Ontario.[4] Hesse would suffer no inconvenience if it were forced to litigate its claim in Canada. The courts of the Province of Ontario are readily available to Hesse in order that it may attempt to protect its interests there. Hesse would receive just treatment of its claim against Toga in the Canadian courts. Upon distribution of the proceeds of the estate under Canadian bankruptcy law, however, Hesse's claim will *not* receive the priority recognition "substantially in accordance with the order prescribed by this title" as required by Section 304(c)(4).

Hesse received a judgment against Toga from a court of competent jurisdiction in the State of Michigan. It perfected its judgment by serving writs of garnishment on several of Toga's creditors. Hesse is thus a lien creditor [5] and, as such, is recognized as holding a secured claim to the extent of the value of its interest in the estate's interest in such property. 11 U.S.C. § 506. Consequently, Hesse would be one of the first creditors to receive payment. 11 U.S.C. § 507.

Under Canadian law, on the other hand, Hesse would most likely be considered an "ordinary creditor." [6] In *The Canadian Credit Men's Trust Assoc. Ltd. v. Beaver Trucking Ltd.* [1959] S.C.R. 311 (Can.Sup. Ct.1959), the court held that funds paid by the garnishee defendant into an escrow account held by the court pursuant to a writ of garnishment did not constitute security for the garnishor/judgment creditor. This decision of the Supreme Court of Canada may be dispositive if Hesse's claim is

tries has met considerable international criticism as in practice it rejects, if not contravenes, the principle of creditor equality and encourages the race to the courthouse." Honsberger, *Conflict of Laws and the Bankruptcy Reform Act of 1978,* 30 Case W.Res.L.Rev. 631, 635 (1980).

3. J. Story, Commentaries in the Conflict of Laws §§ 403–05 (4th ed. 1852), *as cited in* Honsberger, *id.* at 633.

4. Berton, *The Invasion of Canada,* Little Brown & Co., Boston, 1980.

5. Uniform Commercial Code § 9–301(3); M.C. L.A. § 440.9301(3).

6. Section 107 of the Canadian Bankruptcy Act basically divides creditors into four classes for purposes of priority distribution. First, there are secured creditors who are entitled to enforce their claims irrespective of their debtors' bankruptcy proceedings. Second, preferred creditors receive a special priority by virtue of Section 107(a) through (j), and they share *pari passu* as among preferred creditors in any particular sub-class of preferred creditors. Third, ordinary creditors are those creditors among which no distinction is made as to judgment creditors and non-judgment creditors. However, judgment creditors are not treated as possessing any security. Fourth, and finally, deferred creditors are those creditors who, as a matter of policy, receive no payment unless and until all other creditors are paid.

litigated in the Canadian courts.[7] Hesse would not be recognized as holding any security for its claim. Hence, the distribution of the proceeds of Toga's estate under Canadian law, from Hesse's perspective, would not be "substantially in accordance with the order prescribed by this title" pursuant to Section 304(c)(4) of the Code, 11 U.S.C. § 304(c)(4).

The Trustee further argues that the principle of comity should control, thereby serving as a basis upon which this Court should order the fund held by the Wayne County Circuit Court Clerk to be turned over to the Canadian Trustee.

> No law has any effect, of its own force, beyond the limits of the sovereignty from which its authority is derived. The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation depends upon what our greatest jurists have been content to call 'comity of nations ....' 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 163–164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895). It has also been said that " '[t]he effect to be given to foreign judgments is altogether a matter of comity, in cases where it is not regulated by treaty.' " *Hilton v. Guyot,* 159 U.S. at 166, 16 S.Ct. at 144 *quoting* 2 Kent Com. (6th ed.) 120.

In the Legislative History to Section 304 Congress makes the following pronounce-

ment: "Principles of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules." H.Rep. No. 95–595, 95th Cong., 1st Sess. 324–325 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 35 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787, 6281, *as reported in* Part 3 Bankruptcy Code, 1981 Collier Pamphlet Edition, at p. 53. Comity could be promoted by a treaty between the United States and Canada which provides for mutual recognition of each country's bankruptcy laws. The parties have not presented the Court with any evidence, save mere mention, of the existence of such a treaty. The Court's research has, however, discovered the existence of the proposed United States of America-Canada Bankruptcy Treaty (1979).

As far as is known, this proposed treaty is subject to ratification by the Parliament of Canada and the Senate of the United States. The pertinent provisions of the treaty are summarized as follows:

> "The underlying and basic concept of the treaty is that 'there shall be a single administration of the estate of a debtor.'
>
> Jurisdiction, under the treaty, as a general rule is given to the State that has located within its territory 'the greater portion on value of the property of the debtor.'
>
> The Courts of that State will apply its laws to the proceedings and administer the estate. The trustee appointed in the State having jurisdiction will be able to Exercise his powers in both States. The Courts of each State will act in aid of the Court of the other State.
>
> There are minor exceptions to the general principles of the treaty to preserve important policies reflected in the bankruptcy legislation of each county.

---

7. The Trustee herein argues, without merit, that Hesse would fall into the second category of creditors under Section 107(1)(g) of the Canadian Bankruptcy Act. This section is entire-ly inapposite to Hesse's claim for it only concerns priority distribution of fees and costs incurred in the administration of the estate.

While the debtor, his creditors and property are all within Canada or the United States the treaty will have no effect. This will be the situation in the great majority of all cases.

The treaty will apply only where the debtor, his creditors and his property are situated in Canada and partly in the United States. The treaty makes no attempt to superimpose new legislation respecting international bankruptcies upon the existing laws of either country. Instead, it provides for a choice of law which in general, will govern all proceedings.

The treaty should provide an equitable, predictable, efficient and yet flexible system to administer international bankruptcies involving Canada and the United States."

Houlden and Morawetz, Bankruptcy Law of Canada (1979), *supp.* 1981. See also Article 6, Draft of United States of America-Canada Bankruptcy Treaty (1979).

The effect of this treaty, if ratified, on the disposition of this case would cause the Court to grant the Trustee's relief because the "greater portion on value of the property of the debtor" is located in Canada. This treaty has not been ratified and we are not bound by it.

We find that comity requires that Hesse's claim remain in the Michigan and United States courts, there to be fully litigated. In *Macdonald v. Georgian Bay Lumber Co.,* 2 S.C.R. 364 (Can.Sup.Ct.1878), it was held that a judgment rendered by a United States court in bankruptcy directing the turnover of real estate in Canada, owned by the American bankrupt, to the trustee in the United States bankruptcy proceedings has no effect in Canada. In *Williams v. Rice & Rice Knitting Mills Ltd.,* [1926] 3 D.L.R. 225 (Can.1926), it was held that the trustee of a bankrupt estate in the United States may proceed in the courts for the Province of Manitoba for the recovery of assets [8] of the estate located in Canada

which were fraudulently transferred to a Canadian citizen.

In *Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624 (2d Cir.1976), the court held that comity required the New York courts to allow a Canadian trustee in bankruptcy to obtain records, pursuant to Section 12(2) of the Canadian Bankruptcy Act, located in the New York offices of the bankrupt Canadian corporations.

The doctrine of comity, *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139 [143], 40 L.Ed. 95 (1895), applies in the state of New York.... Under it, New York courts recognize the statutory title of an alien trustee in bankruptcy, *as long as* the foreign court had jurisdiction of the bankrupt and *the foreign proceeding has not resulted in* injustice to New York citizens, *prejudice to creditors' New York statutory remedies,* or violation of the laws or public policy of the state. (Emphasis supplied).

*Clarkson Co., Ltd. v. Shaheen,* 544 F.2d at 629, *citing Cole v. Cunningham,* 133 U.S. 107, 122–23, 10 S.Ct. 269, 274, 33 L.Ed. 538 (1890).

This Court must protect United States citizens' claims against foreign judgments inconsistent with this country's well-defined and accepted policies. Trustee Peat Marwick Ltd. conceded that Hesse's secured status as it exists under this country's laws would not receive the same, or substantially similar treatment under Canadian law. In fact, we have found in our examination of Canadian bankruptcy law that Hesse would receive substantially unequal treatment.

Congress has codified common law principles of comity in Section 304 of the Code, 11 U.S.C. § 304. It has vested in this Court a number of flexible factors for consideration of a foreign trustee's claim in an ancillary proceeding, all of which embody a notion of international fair play and justice. Accordingly, the Trustee's request for an injunction against the state court proceedings and

**8.** The assets fraudulently transferred were monies allegedly paid by reason of loan obliga-

tions.

its request for an order directing the $215,-000 fund to be turned over to it are denied.

IT IS SO ORDERED.