**In re IONICA PLC, Debtor.**

**Bankruptcy No. 98 B 48860 SMB.**

United States Bankruptcy Court,
S.D. New York.

Dec. 6, 1999.

record of the increased amounts.

Cadwalader, Wickersham & Taft, New York City, David C.L. Frauman, Gregory M. Petrick, of counsel, for Ionica plc.

Weil, Gotshal & Manges LLP, New York City, Harvey R. Miller, Stephen Karotkin, Marc D. Puntus, of counsel, for Ionica Group plc.

Kelley Drye & Warren LLP, New York City, Mark Bane, Sarah L. Reid, of counsel, for Chase Manhattan Bank, as Indenture Trustee.

Lovell White Durrant, New York City, Gary S. Lee, Felice Berkman Brewer, of counsel, for Nortel Networks plc.

## MEMORANDUM DECISION GRANTING MOTION TO DISMISS CASE

STUART M. BERNSTEIN, Bankruptcy Judge.

Ionica plc ("Ionica") is a debtor in an administration proceeding pending in the United Kingdom. The Joint Administrators appointed by the English court filed this chapter 11 case for the purpose of asserting claims of equitable subordination and substantive consolidation, neither, they say, being available under English law. Ionica's corporate parent, Ionica Group plc ("Group"), the object of these claims, and Nortel Networks plc ("Nortel"), an Ionica creditor, have moved to dismiss this case. In the main, they argue that Ionica lacks a nexus to the United States, and its assets and liabilities should be dealt with in the English proceeding.

The motions require consideration of the relationship between plenary proceedings pending in two different countries, and specifically, whether dismissal is appropriate even if it means that Ionica will lose claims that it can pursue only in the United States. For the reasons discussed be-low, I conclude that under 11 U.S.C. § 304(c), the case should be dismissed, and consequently, I do not reach the other grounds for dismissal advanced by the movants.

## BACKGROUND

### A. Pre–Bankruptcy

At all relevant times, Ionica, a British company, operated a telecommunications business in the United Kingdom. (*Motion of Ionica Group plc to Dismiss Chapter 11 Case of Ionica plc Pursuant to Sections 109(a), 305(a)(2) and 1112(b) of the Bankruptcy Code*, dated Sept. 17, 1999 ("*Group Motion to Dismiss*"), ¶ 1; *Motion Pursuant to Section 105(a) of the Bankruptcy Code for Entry of an Order Approving the Cross Border Protocol Among the Joint Administrators of the Debtor and Debtor in Possession*, dated May 21, 1999 ("*Cross Border Protocol Motion*")[1], ¶ 3.) As a "start up" technology company, Ionica's cash requirements outpaced its income. As a result, it had to borrow.

Although Ionica did not operate in the United States, it came to the United States to raise money through two debt offerings. In August 1996, Ionica issued $150 million 13½% Senior Notes, due 2006; in the second debt offering in March 1997, it issued an additional $420 million 15% Senior Discount Notes, due 2007.[2] The net proceeds from the two offerings totaled $262 million. (*Complaint (Ionica plc v. Ionica Group plc), Adv. No. 99–2262A ("Complaint")*, at ¶ 10.)[3]

Chase Manhattan Bank ("Chase") acted as the indenture trustee in connection with

---

1. The *Cross Border Protocol Motion* is annexed as exhibit A to the *Group Motion to Dismiss*.

2. The holders of the Senior Notes and the Senior Discount Notes are referred to collectively as the "Noteholders."

3. The *Complaint* is annexed as exhibit D to the *Objection by the Debtor to the Motion of*

*Nortel Networks plc to Dismiss the Chapter 11 Case of Ionica plc and for a Stay of Examination or Discovery of Nortel and Its Affiliates and to the Motion of Ionica Group plc to Dismiss the Chapter 11 Case of Ionica plc Pursuant to Sections 109(a), 305(a)(2) and 1112(b) of the Bankruptcy Code*, dated Oct. 4, 1999 ("*Ionica Objection*").

the first offering.[4] (*See Group Motion to Dismiss* ¶ 3.) Chase and Ionica entered into a Collateral Pledge and Security Agreement under which Ionica deposited United States Treasury securities with Chase to secure the first ten interest payments due to the holders of the Senior Notes. (*Id.*, Ex B.) At the time of the filing of this chapter 11 case, the value of the pledged securities stood at $56.6 million, or $97.2 million *less* than the aggregate debt they secured. (*Id.*, ¶ 3.) The pledged securities represented the only tangible property that Ionica had in the United States at the time this case was commenced.

Group was subsequently formed in April 1997 at the request of Ionica's lenders to facilitate additional borrowing. (*Complaint* ¶ 11.) It was contemplated that Group would become Ionica's parent, and use its Ionica stock as collateral for more loans. (*Id.*, ¶¶ 11–12.) The reorganization was accomplished in June 1997, when Group acquired all of the issued and outstanding Ionica stock in exchange for its own stock. (*Group Motion to Dismiss*, Ex. E., ¶ 21.)

Following the reorganization, Group and Ionica participated in two transactions in July 1997, designed to raise extra cash. First, Ionica and Group obtained a $300 million revolving credit facility ("RCF") from a syndicate of banks led by Société Générale. (*Complaint* ¶ 16.) Second, Group consummated an initial public offering ("IPO"), registering and trading its shares, *inter alia*, on the NASDAQ exchange in the form of American Depositary Receipts (ADRs). (*Id.*, ¶ 6.) The IPO generated in excess of £156 million, or $250 million. (*Id.*, ¶ 17.) According to the IPO prospectus, the proceeds were to fund Ionica's expansion and development. (*Id.*, ¶ 18.)

## B. Ionica's Claims Against Group

The RCF and IPO transactions segue into a discussion of Ionica's equitable subordination claim against Group.[5] According to Ionica, Group acted as a conduit; the IPO proceeds were supposed to pass through Group to Ionica on an as-needed basis. Indeed, this is how the Group funding initially worked. Between November 1997 and March 31, 1998, Group routinely down streamed the $20–$25 million that Ionica needed each month. (*Id.*, ¶ 19.)

As Ionica's situation worsened, however, Group started to balk at advancing new funds. In April, 1998, Group refused to downstream more money unless the advances were treated as debt, (*id.*, ¶ 25), and in late May, 1998, Group took the position, for the first time, that it had no contractual obligation to advance the IPO proceeds to Ionica. (*Id.*, 25.) In July, 1998, Ionica and Group entered into a loan agreement that was intended to resolve these issues. The agreement provided that advances made prior to March 31, 1998, would be treated as equity investments, and past and future transfers (including advances treated as debt) would be subordinated to the Noteholders. (*Id.*, ¶ 26.)

We must now take a step back. In September, 1997, Group, Ionica and Société Générale had entered into a First Deed of Subordination that subordinated Group's claims against Ionica to the debts that Ionica owed to the RCF lenders and the Noteholders. (*Id.*, ¶ 20.) During the summer of 1998, the parties entered into a Second Deed of Subordination. The parties have not provided either the First or Second Deeds, but it appears that the First Deed did not expressly subordinate Group's claims to the Noteholders' rights, as required under the indentures. (*See Affidavit of Richard Daniel Hacker Q.C.*

---

4. Marine Midland Bank apparently acted as indenture trustee in connection with the second offering.

5. This portion of the decision is derived from Ionica's Complaint. I assume the allegations to be true for the purposes of deciding the pending motion.

*in Support of Motion to Dismiss Chapter 11 Case of Ionic plc,* sworn to Oct. 20, 1999 ("*Hacker Affidavit*"), Ex. C, ¶ 18.) The Second Deed of Subordination cured this omission by including express subordination provisions. (*Id.*) However, it also contained an additional provision not found in its predecessor—the subordination provisions would terminate when the RCF was canceled. (*Complaint* ¶ 27.)

On the heels of this change, Group terminated the RCF, and obtained a release and discharge from Société Générale. Group has maintained that under the terms of the Second Deed of Subordination, this terminated the subordination of its debt to the claims of the Noteholders. (*Id.*, ¶ 28.) As a result, Group improved its position *vis-a-vis* the other creditors in the aggregate sum of $134 million.[6] (*See id.*, ¶¶ 36–37, 40.) Thereafter, and with few exceptions, Group would only advance additional funds to Ionica on a secured basis.[7] (*Id.*)

## C. The British and American Bankruptcy Proceedings

By October 1998, Ionica's efforts to secure additional financing had become futile. On October 29, 1998, Ionica's Board of Directors presented a petition to the High Court of Justice in London (the "High Court") for the administration of Ionica under the provisions of Part II of the Insolvency Act of 1986 (the "Insolvency Act"). (*See Cross Border Protocol Motion* ¶ 4.) By order dated October 29, 1998, the High Court granted Ionica's petition and appointed three Joint Administrators: Christopher John Hughes and Neville Barry Kahn of Price Waterhouse

Coopers, and Gareth Howard Hughes of Ernst and Young. (*Id.*)

On December 9, 1998, the Joint Administrators submitted an *ex parte* application to the High Court for "liberty" to file a chapter 11 petition for Ionica in the United States. Their goal was not the reorganization of Ionica's business which was admittedly defunct. Rather, they wanted to take advantage of favorable United States bankruptcy law to challenge the secured and unsecured claims of Group either through equitable subordination or substantive consolidation. (*Outline Submissions of Respondents [Joint Administrators] for the Case Management Conference on Monday 12 July 1999,* ¶¶ 3, 6 ("*Outline*")[8]; *Affidavit of Andrew John Owen Wilkinson,* sworn to Dec. 15, 1998, at ¶ 6 ("*First Wilkinson Affidavit*")[9].) Moreover, the contemplated filing was timed to preserve the only United States jurisdictional hook—the securities held by Chase. The Joint Administrators feared that the collateral would soon be released to the beneficiaries, "thereby removing one clear connection between the Company and New York necessary to found jurisdiction for a Chapter 11 case." (*Outline* ¶ 8; *accord First Wilkinson Affidavit* ¶ 8 ("The Joint Administrators have been advised by my firm that the Bankruptcy Court in the U.S. is likely to take jurisdiction provided that the pledged securities remain in place at the time of filing.").)

On the same day, the High Court granted "liberty" to file a chapter 11 petition, and the Joint Administrators filed this case two days later. Ionica's Schedules confirmed that all of its assets were located in the United Kingdom, except for the

---

6. According to the Schedules, the aggregate debt (secured and unsecured) owed to Group is $146.66 million. (*See* Schedules D, F.)

7. According to Ionica's Schedules, Group loaned $28.65 million on a secured basis after August 11, 1998. (*See* Schedule D.)

8. The *Outline* is annexed as exhibit C to the *Group Motion to Dismiss.*

9. Mr. Wilkinson is a partner in the London office of Cadwalader, Wickersham & Taft. His affidavit was submitted to the High Court in connection with Ionica's application for "liberty" to file the chapter 11 case, and is attached to the *Group Motion to Dismiss* as exhibit D. He has also submitted an affidavit on English law which is referred to below as the *Second Wilkinson Affidavit.*

pledged securities held by Chase.[10] (*See Group Motion to Dismiss* ¶ 11.) Most of the creditors were also located in the United Kingdom, although Ionica owed Marine Midland and Chase, as indenture trustees, approximately $350 million—the majority of the debt.

Group and Nortel moved to dismiss Ionica's chapter 11, asserting that Ionica had no connection to the United States, and was ineligible to be a chapter 11 debtor. In addition, Ionica had no business to reorganize, and filed the chapter 11 case solely to pursue claims of equitable subordination and substantive consolidation unique to United States bankruptcy law. This, according to the movants, smacked of bad faith. Finally, the movants argued that the Court should dismiss the petition under 11 U.S.C. § 304(c).

## DISCUSSION

### A. Introduction

■ Section 305(a) authorizes a bankruptcy court to dismiss or suspend a case if a foreign proceeding is pending,[11] and "the factors specified in section 304(c) of this title warrant such dismissal or suspension." Section 304(c) states:

In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

■ The section 304(c) factors reflect the tension between deferring to foreign proceedings and protecting the rights of local creditors, 2 Lawrence P. King et al., *Collier on Bankruptcy* ¶ 304.08[5][b], at 304–37 (rev. 15th ed.1999)("*Collier*"); *see* Daniel M. Glosband et al., *Claims and Priorities in Ancillary Proceedings Under Section 304,* 17 Brook. J. Int'l L. 477, 485 (1991)("*Claims and Priorities*"), the so-called universality and territoriality approaches, respectively, to transnational bankruptcies. Stuart A. Krause et al., *Relief Under Section 304 of the Bankruptcy Code: Clarifying the Principal Role of Comity in Transnational Insolvencies,* 64 Fordham L.Rev. 2591, 2592 (1966)("*Relief Under Section 304*"); *see In re Treco,* 239 B.R. 36, 41 (S.D.N.Y.1999)("*Treco II* "); *In re Hourani,* 180 B.R. 58, 64 n. 9 (Bankr. S.D.N.Y.1995). These factors are guidelines, not requirements. They are designed to give the Court maximum flexibility, and permit it to "make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules." H.R.Rep. No. 95–595, at 324–25 (1977); S.Rep. No. 95–989, at 35 (1978). Thus, although one factor may support granting an ancillary petition, or here, dismissing a chapter 11 case, another may compel the opposite conclusion. In the end, a court must weigh all of the relevant factors in reaching its decision.

---

10. The Court subsequently granted stay relief to Chase with Ionica's consent, permitting Chase to liquidate the collateral.

11. It is undisputed that the English administration proceeding is a "foreign proceeding," *see* 11 U.S.C. § 101(23), and the Joint Administrators are "foreign representatives." *See* 11 U.S.C. § 101(24).

## B. Comity

■ We begin the analysis with comity. *See* 11 U.S.C. § 304(c)(5). " 'Comity' is a doctrine that encourages deference to foreign laws and judgments if macro systemic concepts, such as due process and impartiality, are present in the foreign proceedings." *Collier* ¶ 304.08[5][b], at 304–37.[12] The Second Circuit has often underscored the importance of extending comity in foreign bankruptcy proceedings, *see, e.g., Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir.1999); *Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.)*, 93 F.3d 1036, 1048 (2d Cir.1996); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d at 999; *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir.1985), emphasizing that "deference to foreign insolvency proceedings will, in many cases, facilitate 'equitable, orderly and systematic' distribution of the debtor's assets." *In re Maxwell Communication Corp.*, 93 F.3d at 1048; *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d at 458 ("American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.")

Here, we need not dwell at length on this factor. The English insolvency laws were examined and compared to the Bankruptcy Code by Chief Judge Brozman in *In re Brierley*, 145 B.R. 151, 164–66 (Bankr.S.D.N.Y.1992). Her comparison confirms that English law is consistent with our own concepts of due process and impartiality. Moreover, the laws of the United Kingdom, and specifically its insolvency laws, are generally afforded comity, as are the insolvency laws of the other common law jurisdictions derived from British law. *Lindner Fund, Inc. v. Polly Peck Int'l PLC*, 143 B.R. 807, 810 (S.D.N.Y.1992); *In re Tam*, 170 B.R. 838, 845 (Bankr.S.D.N.Y.1994)(collecting cases); *In re Brierley*, 145 B.R. at 162 n. 5 (same).[13] Ionica does not dispute this basic proposition, but argues that the Court-approved Protocol moots the comity concerns that would normally warrant deference to the English proceeding. I disagree.

At the Court's insistence, Ionica moved for approval of a cross-border protocol to coordinate and harmonize the plenary proceedings pending in London and New York. The Protocol is quite limited, and relates primarily to which law will govern asset sales and professional fees. For example, it provides that United Kingdom assets will be sold in accordance with United Kingdom law, (*Ionica Objection*, Ex. B,

---

12. The classic formulation of "comity" balances the universality and territoriality approaches. In *Hilton v. Guyot*, 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1985), the Supreme Court explained that

"[c]omity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

Thus, although a separate factor in § 304(c), "comity" has traditionally included the other factors listed in section 304(c). *In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 597, 608 (Bankr.S.D.N.Y.1988), *aff'd*, 115 B.R. 442 (S.D.N.Y.1990), *appeal dismissed*, 924 F.2d 31 (2d Cir.1991); *In re Culmer*, 25 B.R. 621, 629 (Bankr.S.D.N.Y.1982); *see Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir.1993)(listing factors).

13. Group's expert on UK law, Mr. Hacker, suggests that this Court should defer to the English court because the English court might not recognize a judgment for equitable subordination or *substantive consolidation* issued by this Court. (*Hacker Affidavit* ¶¶ 14–15.) In other words, I should defer to the English court because it might *not* defer to me. Given the circumstances, the argument seems to be self-defeating. In any event, I am confident that the High Court would apply the same general principles of international comity to United States bankruptcy proceedings that Group asks me to apply in support of its motion to dismiss this one.

at ¶ 12), which includes a certain Memorandum of Understanding relating to the division of responsibilities among the Joint Administrators, and United States assets will be sold in accordance with United States law. (*Id.*, ¶ 13.) Similarly, professional and Joint Administrator fees and expenses incurred in connection with the chapter 11 case will be governed by United States law; any other fees and expenses will be governed by United Kingdom law. (*Id.*, ¶¶ 14–18.) The Protocol also covers filing operating reports and creditors committees in each jurisdiction. (*Id.*, ¶¶ 19–21.) Finally, the Protocol states that subsequently appointed administrators or officeholders facing a dispute may seek directions from either court, (*id.*, ¶ 23), and the Joint Administrators shall use reasonable endeavors to procure the newly appointed person's consent to the Protocol. (*Id.*, ¶ 24.) The Protocol does not address the resolution of claims or disputes, and is immaterial to the resolution of the pending motion.

## C. The Other Section 304(c) Factors

■■ Once a court concludes that the foreign proceeding meets the requisite standard for comity, it must decide how much weight to give to the other factors in section 304(c). 2 *Collier* ¶ 304.08[5][b], at 304–38. Exceptions to comity are narrowly construed when the foreign jurisdiction is also a common law jurisdiction. *In re Singer,* 205 B.R. 355, 357 (S.D.N.Y.1997); *In re Brierley,* 145 B.R. at 163 (quoting *Clarkson Co. v. Shaheen,* 544 F.2d 624, 630 (2d Cir.1976); *see In re Board of Directors of Hopewell Int'l Ins. Ltd.,* 238 B.R.

25, 66 (Bankr.S.D.N.Y.1999)). Initially, § 304(c)(6) does not apply because the debtor is not an individual. As to the remaining factors, neither Ionica nor Chase dispute that English law treats all creditors in a just and fair manner, and does not discriminate in favor of British creditors or against American creditors, 11 U.S.C. § 304(c)(1), the English procedures do not prejudice or inconvenience American creditors in the processing of claims, 11 U.S.C. § 304(c)(2), and English law does not foster preferential or fraudulent dispositions of property. 11 U.S.C. § 304(c)(3).

The opposition focuses, instead, on the concerns targeted by § 304(c)(4), *i.e.,* that the United Kingdom will not distribute the assets of the estate in accordance with United States law. They assert that Ionica has valid claims against Group sounding in equitable subordination and substantive consolidation, and the successful prosecution of these claims will lead to a greater distribution in favor of the unsecured creditors at the expense of Group.[14] Ionica and Chase further contend that English law does not recognize these claims. As a result, if the case is dismissed and Ionica's assets are distributed solely under English law, Group will receive more and the other creditors will get less.

■ Section 304(c)(4) only requires that the foreign distribution scheme be "substantially in accordance" with United States bankruptcy law; it does not have to mirror the United States distribution rules. *In re Manning,* 236 B.R. 14, 25 (9th Cir. BAP 1999); *In re Brierley,* 145 B.R. at 167; 2 *Collier* ¶ 304.08[5][b], at

---

14. Ionica also asserts an *alter ego* claim against Group. *Alter ego* liability, which is synonymous with "piercing the corporate veil," permits a creditor to sue a parent where the parent controls or dominates its subsidiary, uses the control or domination to commit a fraud or other wrong, and as a result, the creditor suffers injury. *Keene Corp. v. Coleman (In re Keene Corp.),* 164 B.R. 844, 851 (Bankr.S.D.N.Y.1994). Thus, it is not sufficient that the parent and subsidiary disregard corporate formalities; the party seeking

to pierce the corporate veil must prove wrongful conduct. Similarly, "piercing the corporate veil" is available under English law where the principal uses the company to conceal the true facts or circumvent the law, and thereby perpetrate a fraud on creditors. *See* 7(1) *Halsbury's Laws of England* ¶ 93, at 86 (4th ed.); *cf. Ord v. Belhaven Pubs Ltd.,* 2 BCLC 447, 456–57 (Eng.C.A.1998) (declining to pierce the corporate veil in the absence of fault, fraud, concealment or other impropriety).

304–39. Consequently, this factor does not preclude deference merely because the foreign distributive scheme subordinates or accords a lower priority to the United States creditor's claim. *See, e.g., Treco II,* 239 B.R. at 41 (Bahamian scheme that gives priority to administrative expenses over secured claim, and requires turnover of collateral, is consistent with § 304(c)(4)). Rather, the distribution scheme must be repugnant to a fundamental principle of American law, *In re Brierley,* 145 B.R. at 167, or render the claim unenforceable. *Cf. Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d at 249 (requirement in Brazilian bankruptcy proceeding that creditor's claims must be converted into local currency might be fundamentally unfair if it rendered the claim valueless or unenforceable).[15]

The United Kingdom's refusal to recognize claims based on equitable subordination or substantive consolidation does not make its law repugnant to our own. Apparently, American non-bankruptcy law also declines to recognize these claims. Otherwise, Ionica could have asserted them without filing this chapter 11 case. Hence, these claims are not fundamental to our basic notions of fairness and justice, and in fact, Ionica and Chase do not contend that they are. Accordingly, the una-

vailability of these claims, without more, does not require the denial of the motions to dismiss. *In re Treco,* 229 B.R. 280 (Bankr.S.D.N.Y.)(*"Treco I"*), *aff'd,* 239 B.R. 36 (S.D.N.Y.1999), which dealt with the unavailability of the equitable subordination remedy, directly supports this conclusion.

There, the liquidators of a Bahamian debtor commenced a § 304 proceeding to recover an account maintained at the Bank of New York. The bank was also a creditor, and opposed the petition on several grounds, including that the remedy of equitable subordination was not available under Bahamian law. *Id.* at 296. In response, Bankruptcy Judge Garrity observed that § 304 does not demand that the Bahamian Companies Act "mirror" the Bankruptcy Code. *Id.* at 298. Rather, the key is whether the foreign insolvency law is repugnant to United States law. *Id.* The Bahamian law substantially complied with United States law, and was consistent with general principles of justice. It afforded due process, did not discriminate against American creditors, and contained provisions for invalidating fraudulent transfers. *Id.* On balance, the absence of an equitable subordination remedy under Bahamian law did not prevent relief under § 304. *Id.*[16]

---

**15.** *In re Papeleras Reunidas, S.A.,* 92 B.R. 584 (Bankr.E.D.N.Y.1988) is not contrary. There, liquidators appointed in a Spanish insolvency proceeding filed an ancillary petition to prevent interference with the collection of the proceeds of the sale of the debtor's trademarks. The United States creditor (Adams) claimed a lien on the trademarks which were the subject of federal court litigation. Bankruptcy Judge Duberstein concluded, based upon the "facts peculiar to this instant case" that he would not defer to a Spanish insolvency proceeding because Adams would "be prejudiced by the omissions of Spanish law and the lack of candor of Papeleras and liquidators." *Id.* at 594–95. While one of the factors identified by Judge Duberstein was the treatment of Adams's judgment lien claim as unsecured, *id.* at 593, he also cited numerous other factors weighing against deference. Spanish insolvency law did not recognize the claim until Adams's judgment had been affirmed on appeal. *Id.* at 590. Consequently,

Adams did not receive notice of the Spanish proceeding, and was deprived of the opportunity to participate. *Id.* Further, by the time the claim was recognized, most of the assets had been liquidated leaving virtually nothing to pay $20 million in claims. *Id.* Thus, Adams's claim was rendered uncollectible, an unacceptable result given that the federal district court had imposed a lien on the trademarks to protect Adams in the Spanish proceeding. *Id.* at 591. Moreover, the Spanish liquidators sold the trademarks during the district court litigation without notice to Adams or the federal district court. *Id.* at 592. Finally, Spanish law condoned the sale as well as certain other possible fraudulent transfers. *Id.*

**16.** Judge Garrity distinguished the facts in *Treco* from *Interpool v. Certain Freights of the M/V Venture Star,* 102 B.R. 373 (D.N.J.1988), *appeal dismissed,* 878 F.2d 111 (3d Cir.1989)

*Treco*'s approach of balancing the § 304(c) factors contrasts sharply with the court's approach in *Toga Mfg. Ltd.*, 28 B.R. 165 (Bankr.E.D.Mich.1983), a case that considered a similar question but reached the opposite conclusion. In *Toga,* the United States creditor ("Hesse") garnished the United States bank accounts and other assets of a Canadian company. A Canadian bankruptcy proceeding was subsequently commenced, and the Canadian court appointed a trustee who brought an ancillary proceeding to recover the garnished assets. The bankruptcy court agreed with the Canadian trustee that Hesse would not be inconvenienced if forced to litigate its claim in Ontario, and that he would receive just treatment in that forum. *Id.* at 168.

The *Toga* court nevertheless refused to grant the ancillary petition. Hesse's judgment lien would be treated as an unsecured claim under Canadian law. Hence, the distribution on his claim would not be substantially in accordance with the order prescribed by the bankruptcy laws. *Id.* at 168–69. Accordingly, the distribution scheme was "inconsistent with this country's well-defined and accepted policies," and "Hesse would receive substantially unequal treatment." *Id.* at 170.

*Toga* has been criticized as ignoring the need for flexibility and placing disproportionate emphasis on protecting a United States creditor at the expense of all other creditors. *In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. at 611 & n. 22;

accord *Treco I,* 229 B.R. at 292; *In re Koreag, Controle et Revision S.A.,* 130 B.R. 705, 714 (Bankr.S.D.N.Y.1991), vacated on other grounds, 961 F.2d 341 (2d Cir.), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *see Relief Under Section 304* at 2601–02. In essence, the *Toga* court treated the § 304(c) factors as elements that the foreign administrator had to prove, rather than as general guidelines the court had to balance. As a result, it failed to weigh the totality of the circumstances, all but one of which pointed toward granting the petition, and knocked out the petition because, in the court's view, the Canadian trustee failed to satisfy one factor.

Using the flexible method of analysis sanctioned by § 304(c), I conclude that Group's and Nortel's motions to dismiss must be granted. All of the § 304(c) factors tip in favor of dismissal with the possible exception of § 304(c)(4). But even that factor does not add weight to the other side. As noted, the absence of the equitable subordination and substantive consolidation remedies does not make English insolvency law repugnant. In truth, no two distribution schemes are identical. If the lack of identity was a determining factor, the other factors would become meaningless, and no ancillary petition could ever survive. *See Claims and Priorities* at 490. Accordingly, my consideration of all of the circumstances compels the conclusion that this Court should defer to the English proceeding.[17]

and *In re Hourani,* 180 B.R. 58 (Bankr. S.D.N.Y.1995), two cases that referred to the absence of equitable subordination as a ground for denying relief to a foreign representative under § 304. He pointed out that the Australian and Jordanian procedures involved, respectively, in those cases suffered from significant procedural and substantive shortcomings which the courts relied on in not deferring to the foreign proceedings. *See Treco I,* 229 B.R. at 296–98. Unlike *Interpool* and *Hourani,* and like *Treco,* the English procedures in the pending case comport with United States principles of procedural and substantive fairness.

17. This conclusion is also consistent with general principles of comity applied outside of section 304. United States courts have traditionally stayed or dismissed United States litigation in deference to foreign insolvency proceedings, *Lindner Fund, Inc. v. Polly Peck Int'l PLC,* 143 B.R. at 809–10 (citing cases), including litigation based on United States securities laws. *Id.* at 810; *Smith v. Dominion Bridge Corp.,* No. Civ. A. 96–7580, 1999 WL 111465, at *3 (E.D.Pa. Mar. 2, 1999); *see Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d at 999–1000 (affirming dismissal of securities fraud action brought against Australian debtor and relating to United States public

## D. Remedies Under English Law

In reaching my conclusion, I have assumed that English law will deprive Ionica's creditors of the remedies of equitable subordination and substantive consolidation based upon the inequitable conduct alleged in Ionica's complaint. I agree that this is seems to be true of substantive consolidation.[18] However, while English law does not recognize a specific claim of equitable subordination, (*Affidavit of Andrew John Owen Wilkinson,* sworn to Oct. 14, 1999, at ¶¶ 8, 11; *Hacker Affidavit,* at ¶ 29), it recognizes the remedy, together with other, monetary remedies, as a means to redress the type of inequitable conduct alleged in the Complaint.

The thrust of the Complaint is that Group used its domination and control of Ionica to improve its position *vis-a-vis* other creditors. The same people managed Ionica and Group, (*Complaint* ¶ 13), and Group knew that Ionica was undercapitalized. (*Id.,* ¶ 33.) Nevertheless, Group permitted Ionica to continue to operate and incur more debt. During the period that Ionica's financial situation deteriorated, Group terminated the agreement that subordinated its claims, required Ionica to treat the advances from the IPO proceeds as debt, and in many cases, insisted on security for its loans.

These allegations arguably state claims for "wrongful trading" and "preference"

under English law.[19] A person commits wrongful trading if, prior to the time a company went into an insolvent liquidation, the person was a director, and "knew or ought to have concluded that there was no reasonable prospect that the company would avoid going into insolvent liquidation." Insolvency Act § 214(2) [20]. "Person" includes a corporation, *see In re Latreefers, Inc.,* [1998] BCLC 271, 279; *Hacker Affidavit* ¶ 41, and a "director" may be a "shadow director." Insolvency Act § 214(7). A "shadow director" is "a person in accordance with whose directions or instructions the directors of the company are accustomed to act," other than those rendering professional advice. Insolvency Act § 251; *see In re Lo–Line Elec. Motors Ltd.,* 1988 Ch. 477, 488–89. Unlike *de jure* or *de facto* directors, the "shadow director" "lurks in the shadows, sheltering behind others who, he claims, are the only directors of the company to the exclusion of himself." *In re Hydrodan (Corby) Ltd.,* [1994] BCC 161, 163. A parent company, like Group, that controls the conduct of the subsidiary's board of directors, can be a "shadow director." (*Second Sheldon Affidavit* ¶ 11.) If Group dominated and controlled Ionica, and permitted it to continue trading although it knew that it was grossly undercapitalized, Group could be liable for wrongful trading. (*Hacker Affidavit* ¶¶ 55–56),

offering, in deference to subsequent Australian liquidation proceeding).

18. Nortel's expert, Mr. Sheldon, theorizes that an English court may order the pooling of the assets and liabilities (*i.e.,* substantive consolidation) of two companies in liquidation, at least under certain circumstances. (*Second Affidavit of Richard M. Sheldon,* dated Oct. 20, 1999 (*"Second Sheldon Affidavit"*), at ¶ 22.) Group, however, is not in liquidation, and I have not been pointed to any authority that empowers an English court to order the pooling of the assets and liabilities of a company in liquidation with those of a non-debtor.

19. In making this statement, I do not mean to rule on the question or invade the province of

the English court. Rather, I merely question Ionica's underlying assumption that it will lose the remedy of equitable subordination, or alternative monetary remedies, *if this case is dismissed* in deference to the English proceeding.

20. Only a liquidator can assert a wrongful trading claim. Although the present English proceeding is an administration rather than a liquidation, this is an *interim* step, and liquidation appears to be inevitable. (*Affidavit of Richard M. Sheldon QC,* dated to Oct. 6, 1999, (*"First Sheldon Affidavit"*), ¶ 20; *Hacker Affidavit* ¶¶ 6–8; *see Affidavit of Michael James Biden in Support of Motion to Dismiss Chapter 11 Case of Ionica plc,* sworn to Oct. 21, 1999, at ¶ 2.)

A person receives a preference under English law if he is a creditor, surety or guarantor, and the debtor takes action that puts the recipient in a better position in a liquidation than he would have been in if the debtor had not taken the action. Insolvency Act § 239(4).[21] The debtor must be motivated by a desire to improve the transferee's position, *id.*, § 239(5), but this is presumed to be the case if the transferor and transferee are "connected," unless the contrary is shown. *Id.*, § 239(6). The Complaint charges that Group improved its position in three ways: terminating the subordination agreement, treating the IPO advances as debt, and, in some instances, insisting on collateral. These allegations arguably assert three separate and distinct preference claims. (*Hacker Affidavit* ¶ 48; *see Second Sheldon Affidavit* ¶¶ 16, 18 (opining that the entry into the Second Deed of Subordination and Group's insistence on secured lending would constitute preferences).) Further, in light of the parties' parent-subsidiary relationship, Group would have to rebut the presumption that Ionica's actions were motivated by a desire to improve Group's position. (*See Hacker Affidavit* ¶ 47(a), at 21; *First Sheldon Affidavit* ¶ 12.)

If Ionica's representatives can prove their statutory claims, they can obtain broad relief against Group.[22] In the case of wrongful trading, the court may declare that Group is liable for the deficiency between assets and liabilities, *see* Insolvency Act § 214(1), or subordinate Group's claims to all other claims. *see id.*, § 215(4). In the case of a preference, the court may set aside the transfer, including any lien, award monetary relief, or subordinate the transferee's claim. (*Hacker Affidavit* ¶¶ 49–50; *First Sheldon Affidavit* ¶ 15;

*see* Insolvency Act § 241(1)(g).) Thus, if the eventual liquidator of Ionica proves these claims, the English court may subordinate Group's claim to the same extent that this Court could subordinate the claim under 11 U.S.C. § 510(c). In addition or in the alternative, the liquidator may recover damages in a sum sufficient to place the creditors in the same position they would occupy if Group had never acted inequitably.

Besides the wrongful trading and preference claims, Ionica (or the Noteholders) may also have common law claims that they can assert against Group. *See Loebig v. Larucci*, 572 F.2d 81, 85 (2d Cir. 1978)("In cases involving the law of common law countries, New York courts generally assume that the foreign law is the same as New York law."); *Dataserv, Ltd. v. Management Techs., Inc.*, No. 90 Civ. 7759, 1993 WL 138852, at *4 n. 3 (S.D.N.Y. Apr. 27, 1993)(same). For example, contractual subordination provisions are enforceable under English law. *In re Maxwell Communications Corp. plc*, [1993] BCLC 1, 20–21; *Hacker Affidavit* ¶ 31. To the extent that Group breached an agreement to subordinate its claims to the Noteholders, the Noteholders can enforce that breach in the English court. In addition, Ionica implies that Group received the IPO proceeds under an obligation to downstream the funds to Ionica. (*See Complaint* ¶ 25.) English law recognizes a claim for breach of contract or breach of trust, and Ionica could recover damages for the breach. (*See Hacker Affidavit* ¶ 36–38.) Further, the Complaint alleges, as a factual matter, that Group's advances were equity rather than debt. (*Complaint* ¶ 40.) If Ionica establishes this fact, the English court will treat the advances as

---

**21.** Unlike United States preference law, *see* 11 U.S.C. § 547, a transfer of assets is unnecessary; any action that improves the creditor's position can constitute a preference. (*Hacker Affidavit* ¶ 46(a) n. 8.)

**22.** Group's expert also opines that the facts alleged in the Complaint may support claims for fraudulent trading under Insolvency Act

§ 213, (*Hacker Affidavit* ¶¶ 60–61), and extortionate credit transactions under Insolvency Act § 244. (*Id.*, ¶¶ 62–63.) In light of the discussion regarding the existence of the wrongful trading and preference claims, there is no need to consider the viability of these other statutory claims.

equity, and subordinate their return to the payment of all creditors. (*Hacker Affidavit* ¶¶ 44–45.)

These English law claims are neither far-fetched nor speculative; the Joint Administrators have already made them indirectly. They previously applied to the High Court for permission to obtain discovery from Group and Olswang, the law firm that represented Ionica and Group. After summarizing their preliminary findings, they told the court:

> [T]he E & Y [Ernst & Young] Administrator considers that there are a number of potential claims available to the Company which the E & Y Administrator is anxious to investigate further. In this regard, the E & Y Administrator is particularly interested in investigating all and any claims the Company may have, including, *inter alia,* claims for wrongful trading (pursuant to Section 214 of the Insolvency Act 1986), preference (pursuant to Section 239 of the Insolvency Act 1986) and other potential breaches of duty by advisors and/or previous officers of the Company.

(*Hacker Affidavit,* Ex. C, at ¶ 31.)

It appears, therefore, that there is ample authority under English law to strip Group's liens and permit the subordination of its claims. In addition, the liquidator can recover monetary damages in an amount sufficient to cover any deficiency. Thus, even if English law does not recognize a claim specifically denominated as equitable subordination, English law nevertheless provides several bases for the same or alternative relief based upon the facts alleged in Ionica's Complaint.

For all of the foregoing reasons, the motions to dismiss are granted. Settle order on notice.